UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>SYNERON, INC.<br><br>Defendant. | **Civil Action No. 1:08-cv-11902-RWZ** |

**PALOMAR MEDICAL TECHNOLOGIES, INC.'S AND THE GENERAL HOSPITAL
CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF**

PALOMAR MEDICAL TECHNOLOGIES, INC.
and THE GENERAL HOSPITAL CORPORATION
*By their attorneys*,

Wayne L. Stoner (BBO# 548015)
Vinita Ferrera (BBO# 631190)
Kate Saxton (BBO# 655903)
Dimple Chaudhary (BBO # 674854)
Sarah Beigbeder Petty (BBO # 666485)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

Table of Contents

Page

I.   Introduction ........................................................................................................................... 1

II.  Background ............................................................................................................................ 2
     A.  The '568 and '844 Patents ........................................................................................... 2
     B.  Prior Claim Construction Proceedings ....................................................................... 3

III. Basic Principles of Claim Construction ............................................................................... 3

IV.  Claim Terms in Dispute ........................................................................................................ 5
     A.  The '568 Patent ............................................................................................................ 5
     B.  The '844 Patent .......................................................................................................... 14

V.   Conclusion ........................................................................................................................... 19

## Table of Authorities

### Federal Cases

*Asyst Techs., Inc. v. Empak, Inc.*,
    268 F.3d 1364 (Fed. Cir. 2001)...................................................................... 9

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)..................................................................... 15

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
    418 F.3d 1225 (Fed. Cir. 2005)...................................................................... 4

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)..................................................................... 14

*Eolas Technologies, Inc. v. Microsoft Corp.*,
    399 F.3d 1325 (Fed. Cir. 2005)...................................................................... 4

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    355 F.3d 1327 (Fed. Cir. 2004)................................................................. 5. 9

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001)...................................................................... 4

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000)..................................................................... 15

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
    355 F.3d 1361 (Fed. Cir. 2004)...................................................................... 4

*Netcraft Corp. v. eBay, Inc.*,
    549 F.3d 1393 (Fed. Cir. 2008)...................................................................... 9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................. 3, 4

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
    279 F.3d 1357 (Fed. Cir. 2002)..................................................................... 15

*TDM America, LLC v. United States*,
    85 Fed. Cl. 774 (Ct. Fed. Cl. 2009) ............................................................. 9

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)...................................................................... 4

*TiVo, Inc. v. EchoStar Communications Corp.*,
    516 F.3d 1290 (Fed. Cir. 2008)...................................................................... 9

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008)...................................................................................................... 4

Federal Statutes

35 U.S.C. § 112 ................................................................................................................................. 4, 8

Other Authorities

U.S. Patent No. 5,595,568……………………………………………………………………….*passim*

U.S. Patent No. 5,735,844……………………………………………………………………….*passim*

U.S. Patent No. 5,405,368……………………………………………………………...…………..12

David Sands, Diode Lasers (Institute of Physics Publishing 2005)…...…………………………11

Walter Koechner, Solid-State Laser Engineering (Springer-Verlag 1998)………………….11, 12

US1DOCS 7661511v1

## I.  Introduction

This Court has construed U.S. Patent Nos. 5,595,568 (the "'568 patent") and U.S. Patent

No. 5,735,844 (the "'844 patent") (collectively, the "Anderson patents") at least twice before.

(*See Palomar Medical Technologies, Inc., et al. v. Cutera, Inc.*, Civil Action No. 02-10258-RWZ

(Memorandum of Decision and Order, Feb. 24, 2004 [Docket No. 77] and Dec. 17, 2005 Order

[Docket No. 173]; *Palomar Medical Technologies, Inc., et al. v. Candela Corp.*, Civil Action

No. 06-11400-RWZ (Memorandum of Decision and Order, Nov. 8, 2007 [Docket No. 72].)  On

August 10, 2010, the Court held a third claim construction proceeding in *Palomar Medical*

*Technologies, Inc. v. Tria Beauty, Inc.*, Civil Action No. 09-11081-RWZ regarding the Anderson

patents, which is still under consideration.  (Docket No. 39.)

Although Syneron, who is represented by the same lawyers as those representing Candela

Corporation in Civil Action No. 06-11400, agrees that the Court's prior constructions are correct,

Syneron now asks the Court to construe numerous other claim terms.  Syneron's proposed

constructions seek to import limitations into the asserted claims and are the same types of

constructions previously rejected by this Court (and another United States District Court), and

are inconsistent with the law and the disclosures of the Anderson patents.

For these reasons, Palomar Medical Technologies, Inc. and The General Hospital

Corporation (collectively, "Plaintiffs") respectfully request that the Court adopt Plaintiffs'

proposed claim constructions of the disputed terms in the Anderson patents as set forth in Exhibit

A attached hereto.

## II.   Background

### A.   The '568 and '844 Patents[1]

The '568 patent is entitled "Permanent Hair Removal Using Optical Pulses."  (Appendix

("App.") Ex. A.)  The '844 patent, a continuation-in-part of the '568 patent, is entitled "Hair

Removal Using Optical Pulses."  (App. Ex. B.)  Generally, the Anderson patents describe

methods and apparatuses for the simultaneous removal of hairs from a skin region using optical

radiation (light), such as light from a laser or lamp, while minimizing damage to the skin.  (App.

Ex. A ['568 patent,] at col. 1:36-44; App. Ex. B ['844 patent] at col. 1:66-2:9.)  As described in

the Anderson patents, the inventive apparatuses and methods have various aspects or

embodiments, including those relating to:

- the characteristics of the optical radiation used;

- the type of optical radiation applicator used;

- the use of cooling of the skin before and/or during irradiation;

- the use of contact and/or pressure upon the skin before and/or during irradiation;

- the matching of the refractive indices of the skin and optical radiation applicator.

(*See, e.g.,* App. Ex. A ['568 patent] at col. 6:58 – col. 10:34; col. 1:44 – col. 2:9; col 3:28

– col 4:65; col. 5:34 – col. 6:56; App. Ex. B ['844 patent] at col. 6:49 - col. 12:17; col. 2:23-43;

col. 4:21-col. 6:9; col. 14:51 - col. 15:16).  These different aspects of the invention are the

subject of different claims of the patents.

The inventions described in the Anderson patents grew out of work at the Massachusetts

General Hospital ("MGH") by Drs. R. Rox Anderson and Melanie Grossman and Mr. William

Farinelli.  Dr. Anderson in particular is one of the pioneers in the science of the use of light in

---

[1]   For the convenience of the Court, attached as App. Exs. C, D, and E are the Court's prior claim construction Orders and as App. Exs. F and G are excerpts of the Plaintiffs' technology tutorial and claim construction briefing previously submitted in *Palomar Medical Technologies, Inc. et al. v. Candela Corp.*, Civil Action No. 06-11400-RWZ.

dermatological applications, and is an undisputed leading pioneer in light-based hair removal. The original application that led to the Anderson patents was filed in February 1995, the '568 patent issued in January 1997, and the '844 patent issued in April 1998.  (App. Exs. A and B.) The patents are owned by MGH and exclusively licensed by Palomar who, in turn, has nonexclusively licensed the patents to 16 companies, who have paid Plaintiffs over $85 million in royalties to date.

      **B.**      **Prior Claim Construction Proceedings**

The Anderson patents have been involved in four separate claim construction proceedings, three before this Court (the *Cutera* and *Candela* cases, in which the Court has already issued decisions, and the *Tria* case, in which oral argument was heard on August 10, 2010), as well as a fourth proceeding before the United States District Court for the Northern District of California (*Lumenis, Inc. v. Palomar Medical Technologies, Inc., et al.*, Civil Action No. 02-5176-MJJ).  On April 20, 2004, following briefing and oral argument by Plaintiffs and Lumenis, the United States District Court for the Northern District of California entered a Claim Construction Order setting forth the construction of the six disputed terms at issue in that proceeding.  The Order, which generally adopted Plaintiffs' proposed constructions, is attached hereto as App. Ex. H.

**III.**      **Basic Principles of Claim Construction**

The Federal Circuit reaffirmed the basic principles of claim construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), *cert. denied*, 546 U.S. 1170 (2006). Briefly stated, those principles are as follows:  The words of a claim are to be given the ordinary and customary meaning that a person of ordinary skill in the art would have understood the claim language to have in light of the patent documents at the time the patent application was filed. *See Phillips*, 415 F.3d at 1313.  A court should derive this "ordinary and customary meaning" by

- 3 -

looking to the claim language, the specification, and the prosecution history.  *See id*. at 1312-14.

In conjunction with this intrinsic evidence, a court may also consider extrinsic evidence—such as

dictionaries—although such evidence is generally "less significant" than the intrinsic record in

determining the meaning of claim language.  *See id*. at 1317, 1318.

It is a well-established principle of claim construction that the claims are not limited to

the preferred embodiments disclosed in the specification.  *See Eolas Technologies, Inc. v.*

*Microsoft Corp.*, 399 F.3d 1325, 1337 (Fed. Cir. 2005) (claims should not be construed

according to preferred embodiment).  Similarly, limitations from the specification should not be

read into the claims.  *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) ("[T]his

court has cautioned against importing limitations from the specification into the claims");

*CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("In examining the

specification for proper context, however, this court will not at any time import limitations from

the specification into the claims"); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361,

1368-69 (Fed. Cir. 2004) (limitations from specifications may not be read into claims); *Teleflex,*

*Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002) ("claims must be read in view

of the specification, but limitations from the specification are not to be read into the claims");

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1333 (Fed. Cir. 2001)

(vacating judgment where limitations from specification were read into the claims).

Claim elements that recite a means for performing a function but do not recite the

structure of the means may be governed by 35 U.S.C. § 112, ¶ 6.  The Federal Circuit has held

that once a court determines that the claim invokes 35 U.S.C. § 112, ¶ 6, the appropriate

framework for construing a claim limitation in means-plus-function format involves two steps: 1)

identify the function recited in the claim; and 2) identify the corresponding structure in the

specification that is necessary to perform the recited function.  *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1370 (Fed. Cir. 2007).  In identifying the "corresponding structure" it is error to identify more structure than that which is "necessary" to perform the recited function. *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334-35 (Fed. Cir. 2004) ("these structures are superfluous to our claim construction analysis because they are not required for performing the claimed function.").

IV.    **Claim Terms in Dispute**

A.    <u>**The '568 Patent**</u>

1.    <u>**Claim Term: "Optical Radiation" ('568 patent, claims 1-10, 13, 14, 18-20, 23-24)**</u>

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
|---|---|
| Light radiation | Light radiation of a single wavelength |

The parties agree that claim term "optical radiation," which appears in independent claims 1 and 14 and in their dependents, refers to "light radiation."  Syneron now seeks further to limit the claim, however, by proposing that "optical radiation" be construed to mean only "light radiation of a single wavelength."  Nothing in the claim language, the specification, or the prosecution history of the '568 patent supports Syneron's proposed construction.  In none of the litigation under the Anderson patents before this Court (or the Northern District of California court) has anyone made this argument before, and numerous companies have paid Plaintiffs royalties on sales of infringing devices that use light radiation of multiple wavelengths.

Claim 1 recites "[a] method of simultaneously removing multiple hairs, each of which is in a corresponding follicle, from a skin region of a patient, said method comprising illuminating the hairs and follicles with a large-area *optical radiation* field delivered by a transparent device

- 5 -

in contact with the skin region, wherein said illuminating heats the hairs and follicles so that the hairs are removed while leaving the skin region substantially free of injury." (App. Ex. A ['568 patent] at claim 1 (emphasis added).) Claim 14 claims "[a] hair-removal device for simultaneously removing multiple hairs, each of which is in a corresponding follicle, from a skin region of a patient, comprising: means for generating ***optical radiation***; and an irradiating unit including a contact device comprising a large-area, optically transparent apparatus having a surface shaped to contact said skin region, said contact device receiving radiation from said means for generating and then delivering the radiation to the skin region of the patient, including the hairs and follicles in the said skin region, through said surface."

Neither claim 1 or 14 even mentions the wavelength of the optical radiation, let alone limits the claimed "optical radiation" to a single wavelength.

Nor does the specification limit "optical radiation" to light radiation of a single wavelength. To the contrary, the specification repeatedly uses the general term "optical radiation" without any such limitation. (*See* App. Ex. A ['568 patent] at Abstract ("A method and apparatus for simultaneously removing multiple hair follicles from a skin region of a patient. The method includes the step of illuminating the hair follicles with a large-area, ***optical radiation*** field by way of a transparent contact device proximal to the skin region.") (emphasis added); *id.* at col. 1:37-41 ("The method includes the step of illuminating the hair follicles with a large-area, ***optical radiation*** field") (emphasis added); col. 1:10-12 ("This invention relates to hair removal methods using ***optical radiation***") (emphasis added); col. 2:14-17 ("The method of this invention is carried out using a device which includes means (***e.g***., a laser) for generating ***optical radiation***") (emphasis added); col. 3:28-30 ("light source 12…***may, for example***, include one or more lasers for generating the irradiating field") (emphasis added).)

- 6 -

In fact, the specification refers explicitly to light sources that generate optical radiation having varying and/or multiple wavelengths. (*See* App. Ex. A ['568 patent] at col. 3:52-56 ("Other properties of the field, *such as the wavelength* and pulse duration, *may be varied* by controls 26) (emphasis added); col. 3:65-67 ("In this case, the light source is preferably an array of diode lasers coupled directly to the irradiating unit") (diode laser arrays may have multiple wavelengths); col. 7:42-49 ("Light sources generating light in the preferred range of 680-1200 nm include diode ($\lambda \approx$ 800-1000 nm), Nd:YAG and Nd:YLF ($\lambda$=1064 and 1053nm), Ti:Saphhire and infrared dye ($\lambda$=700-1000 nm), ruby ($\lambda$=694 nm), and alexandrite ($\lambda$=700-850) lasers. Nd:YAG and diode lasers (particularly arrays of diode lasers) are preferred…").) The specification also repeatedly refers to treatment wavelengths in the plural form. (*See id*. at col. 7:21-23 ("Light having *wavelengths* between 680 and 1200 nm, a range indicated by the arrow 70 in the figure, is effectively absorbed by melanin…") (emphasis added); col. 7:31-32 ("*wavelengths* shorter than 800 nm may be used") (emphasis added).)[2]

Nothing in the claims, specification, or prosecution history of the '568 patent indicates that the term "optical radiation" should be limited in the way Syneron suggests. By contrast, Plaintiffs' proposed construction is consistent with the plain meaning of the claim language and the guidance provided by the specification. Accordingly, "optical radiation" should be construed as "light radiation," as Plaintiffs propose.

2.   **Claim Term:  "means for generating optical radiation" ('568 patent, claims 14, 18-20)**

---

[2]   The specification's reference to *ranges* of wavelengths further confirms that the "optical radiation" of claims 1 and 14 and their dependents is not limited to light radiation of a single wavelength. (*See id*. at col. 7:26-27 ("Light in the *range* of 800-900 nm or 1000 to 1200 nm is preferred") (emphasis added); col. 10:9-10 ("preferred spectral regions (i.e., 800-900 nm or 1000-1200 nm); col 7:42-49 ("Light sources generating light in the preferred range of 680-1200 nm include diode ($\lambda \approx$ 800-1000 nm), Nd:YAG and Nd:YLF ($\lambda$=1064 and 1053nm), Ti:Saphhire and infrared dye ($\lambda$=700-1000 nm), ruby ($\lambda$=694 nm), and alexandrite ($\lambda$=700-850) lasers. Nd:YAG and diode lasers (particularly arrays of diode lasers) are preferred…"); and Table 1.)

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
|---|---|
| Plaintiffs agree that this is a "means plus function" § 112 claim term.  Plaintiffs further state that the corresponding structure disclosed in the '568 patent is a light source. | As a "means plus function" § 112 claim term, the corresponding structure disclosed in the specification—a laser |

The parties agree that the claim term "means for generating optical radiation," which appears in claim 14 and in its dependents, is a means-plus-function claim term covered by 35 U.S.C. § 112, ¶ 6.  But Syneron seeks again to further limit claims 14 and 18-20 by asserting that the corresponding structure "for generating optical radiation" must be only a laser.  Syneron's position is contrary to the explicit disclosure of the '568 patent.

The specification of the '568 patent repeatedly discloses that the structure that performs the generation of optical radiation is a "light source" broadly, not only a laser.  (App. Ex. A ['568 patent] at 3:34-36 ("During the hair removal therapy, the *light source* is powered by a voltage and current supply 20 and delivers a beam of light through the optics 14 and fiber optics 16 to the irradiating unit 18.") (emphasis added); col. 3:53-56 ("Other properties of the field, such as the wavelength and pulse duration, may be varied by controls 26 which adjust components … of the light source); col. 3:63-66 ("In alternate embodiments, the light source, coupling optics, and irradiation unit may be encompassed in a single, hand-held device.  In this case, the light source is *preferably* an array of diode lasers") (emphasis added).)

The '568 specification further confirms that this light source may be, but is not necessarily, a laser.  (*See id*. at col. 2:14-17 ("The method of this invention is carried out using a device which includes means (*e.g*., a laser) for generating optical radiation") (emphasis added); col. 3:28-30 ("light source 12…*may, for example*, include one or more lasers for generating the irradiating field") (emphasis added).)  *See also TDM America, LLC v. United States*, 85 Fed. Cl.

774, 800-01 (Ct. Fed. Cl. 2009) ("The Court favors a broad interpretation of "dredged material" as encompassing any material that can be dredged.  The Court agrees with Plaintiff that the specification language cited by Defendant above merely explains that "dredged material" ***may*** include material removed from a subaqueous location such as a waterway but is not limited to material from a subaqueous source….The Court will not read this limitation into the claim absent language that explicitly restricts "dredged material" to a substance deriving from a subaqueous source.") (emphasis original); *see also TiVo, Inc. v. EchoStar Communications Corp.,* 516 F.3d 1290, 1297 (Fed. Cir. 2008) ("The specification likewise demonstrates that the claim language should not be given such a restrictive interpretation.  At several points, the specification refers to a DVR that accepts television input streams "in a multitude of forms, ***for example***, analog forms such as National Television Standards Committee (NTSC) or PAL broadcast, and digital forms such as Digital Satellite System (DSS), Digital Broadcast Services (DBS), or Advanced Television Standards Committee (ATSC)" (emphasis original; internal quotations omitted); *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1393, 1400 (Fed. Cir. 2008) ("As the district court determined, … an invention is not limited to its examples") (internal quotations omitted).

The claim language and the specification confirm that the corresponding structure for the "means for generating optical radiation" is a light source.  Nothing in the prosecution history suggests otherwise.  Syneron's attempt to limit the corresponding structure to a laser only therefore finds no support in the intrinsic evidence or the case law, and should be rejected.  *See Golight,* 355 F.3d at 1334-35; *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations.").

3.     **Claim Term: ""the wavelength" ('568 patent, claims 8-10)**

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
| --- | --- |
| One or more wavelengths | A single wavelength |

Syneron again attempts to narrow the asserted claims by requiring that "the wavelength" be construed as "a single wavelength."  Syneron's position is contradicted by the claim language and specification of the '568 patent.

*First,* the asserted dependent claims do not limit the construction of "the wavelength" to "a single wavelength."  Rather, the claim language expressly contemplates optical radiation performed with *ranges* of wavelengths: "680 nm and 1200 nm" and "800 and 900 nm or between 1000 and 1200 nm."  (App. Ex. A ['568 patent] at col. 12: 60-63.)

*Second*, Syneron's proposed construction is inconsistent with the specification of the '568 patent because the light sources disclosed in the patent do not necessarily emit "a single wavelength."  (*See id*. at col. 7:21-23 ("Light having *wavelengths* between 680 and 1200 nm, a range indicated by the arrow 70 in the figure, is effectively absorbed by melanin….") (emphasis added); col. 7:31-32 ("*wavelengths* shorter than 800 nm may be used") (emphasis added); col. 3:52-56 ("Other properties of the field, *such as the wavelength* and pulse duration, *may be varied* by controls") (emphasis added).)

Moreover, the specification describes lasers (which may be referred to by a single wavelength) as an exemplary light source and notes the possible use of different diode, Nd: YAG, and Nd: YLF lasers, among others.  (*Id.* at col. 43-47 ("Light sources generating light in the preferred range of 680-1200 nm include diode ($\lambda$=800-1000 nm), Nd:YAG and Nd:YLF ($\lambda$=1064 and 1053 nm), Ti: Sapphire and infrared dye ($\lambda$=700-850 nm), ruby ($\lambda$=694 nm), and

- 10 -

alexandrite (λ=700-1000 nm) lasers").)  These lasers, however, are not necessarily

monochromatic sources; they can emit light over a range of wavelengths.  For example, the

specification notes that "an ***array*** of diode lasers" is a preferred light source.  (*Id.*, col. 3: 63-66

(emphasis added).)  In an array of diode laser bars, each individual diode is non-coherent and has

a different spectrum of wavelengths.  These spectrums of wavelengths for individual diode lasers

create a total spectrum of wavelengths in diode laser array, which can include a considerable

range.  (*See* App. Ex. J [David Sands, Diode Lasers (Institute of Physics Publishing 2005)] at 47

("The output of a diode laser will usually consist of ***several discrete wavelengths*** (figure 3.12)."

(emphasis added)); App. Ex. K [Walter Koechner, Solid-State Laser Engineering (Springer-

Verlag 1998)] at 288 ("More difficult to achieve is a narrow spectral width in an array….

Individual laser diodes have a spectral width of 20 to 40Å full width, half maximum.

Compositional changes and temperature gradients within an array lead to ***a much broader***

***spectral output*** for the whole array as compared to a single device.") (emphasis added).)

Similarly, Nd:YAG, Nd:YLF and ruby lasers normally have a spectrum in wavelengths of

generations which include several wavelengths. (App. Ex. K [Walter Koechner, Solid-State

Laser Engineering] at 211 (discussing Nd:YAG and ruby lasers and noting that "[i]f a laser is

operated without any mode-selecting elements in the cavity, then the spectral output will consist

of a large number of discrete frequencies determined by the transverse and axial modes. ...Laser

emission occurs at those wavelengths at which the product of the gain of the laser transition and

the reflectivity of the mirrors exceed unity."); Figure 5.35.)

Syneron's proposed construction also fails because non-laser light sources that can emit

multiple wavelengths are clearly contemplated by the specification.  (App. Ex. A ['568 patent] at

col. 2: 14-16 ("The method of the invention is carried out using a device which includes means

(*e.g.* a laser) for generating optical radiation.") (emphasis added).)  Non-laser light sources are not of "a single" or very narrow wavelength band.  (*See also* App. Ex. L [U.S. Patent No. 5,405,368] at col. 2: 45-51 ("[I]t is desirable to provide a light source having a wide range of wavelengths, which can be selected according to the required skin treatment ….Pulsed non-laser type light sources such as linear flashlamps provide these benefits."); App. Ex. K [Walter Koechner, Solid-State Laser Engineering] at 254 (Figure 6.5), 255 (Figure 6.6).)

*Finally*, the specification discloses ranges of values for wavelengths, further supporting Plaintiffs' proposed construction of "one or more wavelengths."  (*See id.* col. 1: 66-67, col. 2: 1-3 ("The wavelength of the optical radiation is chosen to be selectively absorbed by hair follicles, and is preferably between 680 and 1200 nm; in especially preferred embodiments, the wavelength is between 800 and 900 nm, or, alternatively, between 1000 and 1200 nm."); col. 7: 27-28 ("light in the ***range*** of 800 to 900 nm or 1000 to 1200 nm is preferred") (emphasis added).)  For example, Table 1, which discloses preferred values for the parameters of the optical fields, provides ranges of values to demonstrate that a wide bandwidth of radiation is acceptable. (*See id.* at col. 10: 20-25.)

The claim language and specification of the '568 patent contain no evidence that "the wavelength" should be limited as Syneron proposes.  Plaintiffs' construction is consistent with the plain meaning of the claim language and the specification.  Accordingly, "the wavelength" should be construed as "one or more wavelengths".

    4.    **Claim Term:  "wherein said illuminating heats the hairs and follicles so that the hairs are removed" ('568 patent, claims 1-10, 13, 23-24)**

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
| --- | --- |
| Plaintiffs do not dispute Syneron's proposed construction. | Wherein the hair is removed as a result of the heating of the hairs and follicles by |

| | illumination |
|---|---|

Syneron has proposed to construe the claim term "wherein said illuminating heats the hairs and follicles so that the hairs are removed" as "wherein the hair is removed as a result of the heating of the hairs and follicles by illumination."  Plaintiffs do not dispute Syneron's proposed construction.

5. **Claim Term : "removing multiple hairs, each of which is in a corresponding follicle, from a skin region" ('568 patent, claims 1-10, 13, 14, 18-20, 23-24)**

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
|---|---|
| Plain meaning | Removal of more than one hair from hair follicles in a skin region (whether the removal is permanent or temporary) |

The claims of the '568 patent require "removing multiple hairs, each of which is in a corresponding follicle, from a skin region of a patient."  (App. Ex. A ['568 patent] at col. 12:32-34).  This language is clear and unambiguous, and does not require further construction. Syneron's construction is incorrect because the claim language does not require removal of more than one hair "from" hair follicles, but only that the hairs removed are "in" corresponding hair follicles.

As the Court is aware, the "hair removal" technology of the patents-in-suit is not a physical extraction of a hair from a follicle, but a disruption of the growth mechanisms of the follicle so that the hair stops growing and is therefore "removed."

6. **Term Syneron Contends Is Indefinite: "substantially free of injury" ('568 patent, claims 1-10, 13)**

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
|---|---|

| Plain meaning | *Syneron contends this term is indefinite.* |

Syneron contends that the term "substantially free of injury," which appears in claims 1-10 and 13, is indefinite. This is not so, and Syneron has not explained why it believes this term is indefinite.

The claims of the '568 patent require "the hairs to be removed while leaving the skin region substantially free of injury." (App. Ex. A ['568 patent] at col. 12:37-39.) As the claim language makes clear, this means that the skin region from which the hairs are removed should be substantially free of injury following treatment. There is nothing indefinite about this language; it can and should be construed according to its plain meaning. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) ("Only claims not amenable to construction or insolubly ambiguous are indefinite.") (internal quotation marks and citation omitted).

**B.      The '844 Patent**

1.      **Claim Term: "the wavelength;" "a wavelength" ('844 patent, claims 27, 41, 46-49)**

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
|---|---|
| One or more wavelengths | A single wavelength |

As with its proposed construction for the '568 patent, Syneron again seeks to import limitations into the asserted claims of the '844 patent.

*First*, Syneron's proposed construction of "a wavelength" as only "a single wavelength" is contrary to the language of the asserted claims. Claim 27 offers a range of possible wavelength values, describing an apparatus "comprising" "a source of optical radiation of a

- 14 -

wavelength between 680 and 1,200 nm." (App. Ex. B ['844 patent] at col. 18:45.) Similarly,

Claim 41 describes a method using a light source producing "a wavelength *or wavelengths*

between 680 and 1200 nanometers," explicitly contemplating the use of multiple wavelengths by

a light source. (App. Ex. I [Ex Parte Reexamination Certificate for '844 patent] at col. 1:38-40

(emphasis added).)

*Second,* it is a well-established matter of claim construction, that "a" ordinarily means

"one or more." *See, e.g., Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d

1357, 1370 (Fed. Cir. 2002) ("It is well settled that the term 'a' or 'an' ordinarily means 'one or

more'."); *KCJ Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1356 (Fed. Cir. 2000). ("This

court has repeatedly emphasized that an indefinite article "a" or "an" in patent parlance carries

the meaning of "one or more" in open-ended claims containing the transitional phrase

"comprising."). "That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than

merely as a presumption or even a convention. The exceptions to this rule are extremely limited:

a patentee must 'evince[ ] a clear intent' to limit 'a' or 'an' to 'one.'" *Baldwin Graphic Systems,*

*Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (citation omitted). Syneron's

proposed construction of "a wavelength" as "a single wavelength" must fail as the claim and

specifications do not evidence any intent to limit "a" to "one." The patent is replete with

examples indicating the opposite.

*Third*, the subsequent use of "the wavelength" in dependent claims 46-49 does not

suggest that those claims intended to limit "the wavelength" to a "single" wavelength, but refers

back to "a" (one or more) wavelengths in the independent claim. Like the claim language in the

'568 patent, claims 46-49 discuss optical radiation performed with ranges of wavelengths. (App.

Ex. I [Ex Parte Reexamination Certificate for '844 patent] at col. 2:7-14 ("A method as claimed

- 15 -

in claim 45, wherein the wavelength is between 700-1200 nanometers.").)  "The subsequent use of definite articles "the" or "said" in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning."  *Baldwin Graphic Systems, Inc.*, 512 F.3d at 1343.

*Fourth*, for the reasons stated above regarding the specification of the '568 patent, Syneron's proposed construction of "a single", non-varying wavelength is not consistent with the specification of the '844 patent.  (*See* App. Ex. B ['844 patent] at col. 4:47-49 ("Other properties of the field, such as *wavelength* and pulse duration, *may be varied* by controls….") (emphasis added); col. 4:62-63 ("the light source is preferably an *array* of diode lasers coupled directly to the irradiating unit….") (emphasis added); col. 8:47-48 ("Light having *wavelengths* between 680 and 1200 nm") (emphasis added); col. 8:53-54 ("light in the *range* of 680 to 900 nm or 1000 to 1200 nm is preferred") (emphasis added); col. 8:56-59 ("For patents with less melanin present in the hair follicles (e.g. with auburn or light brown hair), the shorter *wavelengths* in this region are preferable because of the higher absorption coefficient of melanin." (emphasis added); col. 9:4-8 ("Sources generating visible or near-infrared light in the preferred *range* of 680-1200 nm include diode ($\lambda$=800-1000 nm), Nd:YAG and Nd:YLF ($\lambda$=1064 and 1053 nm), Ti: Sapphire and infrared dye ($\lambda$=700-850 nm), ruby ($\lambda$=694 nm), and alexandrite ($\lambda$=700-1000 nm) lasers.") (emphasis added); col. 12:5-15 (Table 1).)

*Finally*, as with the '568 patent, the prosecution history never suggests "a wavelength" or "the wavelength" shall be limited to a single wavelength.  The inventors never distinguished their invention from the prior art by saying it only used one wavelength or only a single wavelength laser.

- 16 -

2.    **Claim Term: "a selected wavelength" ('844 patent, claims 1-3, 6-8, 17-19, 32, 38, 42, 45-49)**

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
|---|---|
| One or more chosen wavelengths | A single chosen wavelength |

Again, Plaintiffs proposed construction adopts the ordinary and plain meaning of the disputed claim term. And again, as with its proposed constructions for "a wavelength" and "the wavelength," Syneron seeks to import limitations into the asserted claims.

*First*, nothing in the claim language evidences an intent to limit "a selected wavelength" to "a single chosen wavelength." (*See id.* at col. 15:54-67, col. 16:1-13, 18-25; col. 17:17-57; col. 19:7-10; col. 20:1- 8; *see also* App. Ex. I [Ex Parte Reexamination Certificate for the '844 patent] at col. 1:29-31, 40-43; col. 2:5-6.)

*Second*, for the reasons stated above, Syneron's proposed construction of "a single, chosen" wavelength is not consistent with the specification of the '844 patent, which discloses optical radiation from light sources with multiple, varying wavelengths. (*See* App. Ex. B ['844 patent] at col. 4:47-49 ("Other properties of the field, such as *wavelength* and pulse duration, *may be varied* by controls….") (emphasis added); col. 4:62-63 ("the light source is preferably an *array* of diode lasers coupled directly to the irradiating unit….") (emphasis added); col: 8:47-48 ("Light having *wavelengths* between 680 and 1200 nm") (emphasis added); col. 8:53-54 ("light in the *range* of 680 to 900 nm or 1000 to 1200 nm is preferred….") (emphasis added); col. 8:56-59 ("For patents with less melanin present in the hair follicles (e.g. with auburn or light brown hair), the shorter *wavelengths* in this region are preferable because of the higher absorption coefficient of melanin." (emphasis added); col. 9:4-8 ("Sources generating visible or near-infrared light in the preferred *range* of 680-1200 nm include diode ($\lambda$=800-1000 nm), Nd:YAG

- 17 -

and Nd:YLF ($\lambda$=1064 and 1053 nm), Ti: Sapphire and infrared dye ($\lambda$=700-850 nm), ruby ($\lambda$=694 nm), and alexandrite ($\lambda$=700-1000 nm) lasers.") (emphasis added); col. 12:5-15 (Table 1).)

Nothing in the claim language, specification, and prosecution history of the '844 patent suggests that "a wavelength," "the wavelength," or "a selected wavelength" should be limited as Syneron asserts.

3.    **Claim Term: "Removal of a plurality of hairs from a skin region, each hair being in a follicle extending into the skin from a skin surface" ('844 patent, claims 1-3, 6-8, 17-19, 27, 32, 38, 41-42, 45-49)**

| Plaintiffs' Proposed Construction | Syneron's Proposed Construction |
|---|---|
| Plain meaning | Removal of more than one hair from hair follicles in a skin region (whether the removal is temporary or permanent) |

Similar to the '568 patent, the claims of the '844 patent require "removal of a plurality of hairs from a skin region, each hair being in a follicle extending into the skin from a skin surface" (not removal of hairs "from hair follicles" as discussed above).  (App. Ex. B ['844 patent] at, e.g., claim 1.)  Like the asserted claims of the '568 patent, this language is clear and unambiguous, and does not, as Syneron proposes, require further construction.

4.    **Terms Syneron Contends Are Indefinite**

Once again, without explanation, Syneron contends that the following claim terms that appear in the '844 patent are indefinite:

- "At most minimal heating" (Claims 1, 3, 6-8, 19)

- "Without causing significant damage" (Claim 19)

- "Not significantly damaged" (Claim 45)

- "Significant permanent hair loss" (Claim 42)

Plaintiffs disagree that these terms are indefinite.  The claim language for each of these terms is clear and unambiguous, and each term should be construed according to its plain and ordinary meaning.  For example, the claim language "at most minimal heating" means that there is "at most minimal heating" of the "skin in said skin region."  (App. Ex. B ['844 patent] at col. 15:67 – col. 16:1.)

## V.     Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court construe the claim terms above as Plaintiffs have proposed in the claim construction statement, attached hereto as Exhibit A.

Respectfully submitted,

PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION

By their attorneys,

 /s/ Dimple Chaudhary
Wayne L. Stoner (BBO # 548015)
Vinita Ferrera (BBO # 631190)
Kate Saxton (BBO # 655903)
Dimple Chaudhary (BBO # 674854)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000
Dated:  September 20, 2010          (617) 526-5000

US1DOCS 7661511v1

<u>CERTIFICATE OF SERVICE</u>

I, Dimple Chaudhary, counsel for Plaintiffs Palomar Medical Technologies, Inc. and The General Hospital Corporation hereby certify that on September 20, 2010 a true copy of the above document was served upon counsel of record for Syneron, Inc. by ECF.

  /s/ Dimple Chaudhary       

Dimple Chaudhary (BBO # 674854)
