# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> SYNERON INCORPORATED, <br><br> Defendant. | **Civil Action No.  08-11902 (RWZ)** |
| SYNERON INCORPORATED, <br><br> Counterclaimant, <br><br> PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION, <br><br> Counterdefendants. | **ORAL ARGUMENT** <u>**REQUESTED**</u> <br><br><br> **TECHNOLOGY TUTORIAL** <u>**REQUESTED**</u> |

## <u>SYNERON INCORPORATED'S OPENING CLAIM CONSTRUCTION BRIEF</u>

## <u>[NON-CONFIDENTIAL]</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................... 2

    A.    The Claims of the Patents in Suit .......................................................... 2

        1.    The '568 Patent ............................................................................ 2

        2.    The '844 Patent ............................................................................ 3

    B.    The Specifications of the Patents in Suit ................................................ 3

        1.    The Wavelength of Optical Radiation .......................................... 4

        2.    Pulse Durations of Optical Radiation ........................................... 5

        3.    The Spatial Profile of Optical Radiation ...................................... 5

        4.    The Intensity of Optical Radiation ............................................... 6

        5.    Alternative Embodiments of the Invention ................................. 6

    C.    Representations Made to the U.S. Patent and Trademark Office ........... 7

    D.    The '913 European Patent ...................................................................... 8

    E.    The Development of Laser and Incoherent Light-Based Hair Removal
        Systems ................................................................................................. 9

        1.    Dr. Anderson's work on laser hair removal ................................. 9

        2.    Dr. Eckhouse's work on light-based hair removal .................... 10

III.    ARGUMENT ...................................................................................................... 11

    A.    Law of Claim Construction ................................................................. 11

    B.    The '844 Patent Claim Terms .............................................................. 12

        1.    "a selected wavelength"—Claims 1-3, 6-8, 17-19, 32, 38, 42, and
            45-49 ......................................................................................... 13

        2.    "a wavelength"—Claims 27 and 41 ......................................... 14

        3.    Palomar's proposed constructions would invalidate the claims .............. 17

        4.    "removal of a plurality of hairs from a skin region, each hair being
            in a follicle extending into the skin from a surface" – Claims 1-3,
            6-8, 17-19, 27, 32, 38, 41-42, and 45-49 .................................. 19

    C.    The '568 Patent Claim Terms .............................................................. 20

        1.    "means for generating optical radiation" – Claims 14, 18-20 ................. 20

        2.    "optical radiation" – Claims 1-10, 13, 14, 18-20, and 23-24; "the
            wavelength" – Claims 8-10 ....................................................... 22

## TABLE OF CONTENTS
(continued)

**Page**

3.   "removing multiple hairs, each of which is in a corresponding follicle, from a skin region" – Claims 1-10, 13, 14, 18-20, and 23-24 ....................................................................................................... 25

IV.   CONCLUSION ....................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Auto. Techs. Int'l, Inc. v. BMW of N. Am. Inc.*,
  501 F.3d 1274 (Fed. Cir. 2007) ............................................................. 12, 18

*Biomedino, LLC v. Waters Techs. Corp.*
  490 F.3d 946 (Fed. Cir. 2007) ............................................................. 21, 22

*Blackboard, Inc. v. Desire2Learn Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ............................................................. 21, 22

*Gentry Gallery, Inc. v. Berkline Corp.*,
  134 F.3d 1473 (Fed. Cir. 1998) ............................................................. 12, 18, 25

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ............................................................. 15

*Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*,
  309 F.3d 1365(Fed. Cir. 2002) ............................................................. 24

*LizardTech, Inc. v. Earth Re. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ............................................................. 12, 17, 18, 19

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
  324 F.3d 1308 (Fed. Cir. 2003) ............................................................. 20

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ...................................... 11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech., Co., Ltd.*,
  521 F.3d 1351 (Fed. Cir. 2008) ............................................................. 12, 19

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
  442 F.3d 1331 (Fed. Cir. 2006) ............................................................. 12, 16

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................. passim

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................. 12

*Wright Med. Tech., Inc. v. Osteonics Corp.*,
  122 F.3d 1440 (Fed. Cir. 1997) ............................................................. 24

# TABLE OF CONTENTS
(continued)

**Page**

**STATUTES**

35 U.S.C. § 112 ¶ 6 ............................................................................................................. 20, 22

## I.   INTRODUCTION

Only approximately half of Syneron Incorporated's ("Syneron's) hair removal devices employ lasers.  The remainder use incoherent, non-laser, broadband light sources instead. Plaintiffs Palomar Medical Technologies and The General Hospital Corporation (collectively, "Palomar") are now advocating impermissibly expansive constructions of critical claim terms in an effort to expand the reach of the patents-in-suit, beyond the disclosures of the specifications, to encompass the entirety of Syneron's depilation system portfolio.[1]  This is improper.

Palomar ignores repeated and unambiguous statements in the specifications of both patents in suit to propose that the asserted claims cover hair removal methods and devices using optical radiation comprising multiple wavelengths.  The specifications of the patents in suit— including *every* description, discussion, reference, and embodiment contained in both patents— indicate that the patents relate solely to hair removal using light of a single wavelength (monochromatic light), such as that emitted by lasers.  They have nothing to do with, and do not even mention, the use of incoherent broadband light (*i.e.*, light of multiple wavelengths, such as from a flashlamp) for hair removal.  Palomar's overly expansive interpretations of the terms ignore all the context provided by the patents and are contrary to well-established Federal Circuit precedent.

The European Patent Office has determined, based on a related and corresponding European patent with an identical specification to one of the patents in suit, that Palomar has no right to claims that would exclude others from using incoherent broadband light systems to

---

[1] Syneron's hair reduction systems are also unique in that they employ a combination of light energy (laser or non-laser energy) and radio frequency ("RF") energy, which provides synergistic benefits.  The RF energy precisely targets areas pre-heated by the light energy, enabling the use of less light energy, and improving the ability to treat patients with dark skin. Syneron respectfully requests an opportunity to present a short "Technology Tutorial" at the Claim Construction hearing.

remove hair because the patent's disclosure is limited to hair removal using light of a single wavelength.  As explained below, this Court should hold likewise.

## II.     BACKGROUND

The specifications of the patents in suit, U.S. Patent Nos. 5,595,568 ("the '568 Patent") and 5,735,844 ("the '844 Patent"), originate from, and claim priority to, the same patent application.  The '844 Patent is a continuation-in-part of the '568 Patent.  Thus, their specifications are substantially similar.  Palomar's related and corresponding European Patent, European Patent No. 806913 ("the '913 European Patent"), also claims priority to that same patent application.  But for slight variations accounting for European spelling and certain citations to prior art, the specifications of the '844 Patent and the '913 European Patent are identical.

The specifications of the patents-in-suit demonstrate that Palomar's effort to expand the scope of the asserted claims to encompass methods and devices that use incoherent broadband light comprising multiple wavelengths to remove hair is improper.  The disclosures of these patents are limited to methods and devices for hair removal using optical radiation of a single wavelength, such as that emitted by a laser.

### A.     The Claims of the Patents in Suit

#### 1.     The '568 Patent

Entitled, "Permanent Hair Removal Using Optical Pulses," the '568 Patent contains 24 total claims, 16 of which are asserted by Palomar in this matter.  Claims 1 and 14 are the only independent claims of the '568 Patent asserted in this case.  Claim 1 claims a method of simultaneously removing multiple hairs from a skin region using "optical radiation," while Claim 14 claims a device for the simultaneous removal of multiple hairs that includes a "means for generating optical radiation."  The remaining '568 Asserted Claims depend from either Claim 1 or Claim 14, and therefore contain the identical limitations (in addition to others unique to each claim) found in the claim from which they depend.

### 2.    The '844 Patent

Entitled "Hair Removal Using Optical Pulses," the '844 Patent includes 59 claims, 18 of which are asserted by Palomar in this case.  Claims 1, 17, 19, 27, and 32 are the only independent asserted claims.  Claims 1, 17, 19, and 32 each claims a method of simultaneously removing multiple hairs from a skin region by applying light of "a selected wavelength," while Claim 27 claims a device that simultaneously removes hair using light of "a wavelength" between two specified parameters.  The remaining '844 Asserted Claims depend from either Claim 1, Claim 17, or Claim 32.

### B.    The Specifications of the Patents in Suit

The specifications of the patents in suit are substantively the same, as both originate from the same initial patent application filed on February 1, 1995.  Both contain the same drawings (the '844 Patent containing one additional figure), each of which is explained in the written description.  Figure 1 "is a perspective view of the ***laser-based*** hair-removal device according to the invention."  (Declaration of Nicole M. Smith in Support of Syneron Incorporated's Opening Claim Construction Brief ("Smith Decl."), Exhibit A ('568 Patent), col. 2, ll. 60-61; *see also* Smith Decl., Exh. B ('844 Patent), col. 3, ll. 46-47 (emphasis added).)  Figure 9 "is a plot showing the temperature rise [of a skin region of a patient] as a function of ***laser*** pulse energy [and other variables] of eight different patients."  (Smith Decl., Exhs. A, col. 2, ll. 21-23; B, col. 4, ll. 8-10) (emphasis added).  The remaining figures show other details related to the claimed invention.  None of the figures discloses details about non-laser based systems.

Although the patents-in-suit include general references to "optical radiation," the only sources of optical radiation disclosed in their specifications are single wavelength sources, namely lasers.  (Smith Decl., Exhs. A, col. 7, ll. 43-53; B, col. 9, ll., 4-14.)  Additionally, the patents-in-suit only teach how to remove hair using optical radiation of a single wavelength.  The patents explain how to generate optical radiation with all the properties needed to achieve hair removal—including the appropriate wavelength, pulse duration, spatial profile and intensity—

using a monochromatic light source, namely a laser.  They do not teach how to generate optical radiation with the required parameters using a source of optical radiation that includes multiple wavelengths, such as an incoherent broadband non-laser device.

### 1.       The Wavelength of Optical Radiation

The patents-in-suit only discuss the use of optical radiation of a single wavelength.  For example, the patents state that "in order to selectively heat the target regions, ***the wavelength of the irradiating field*** is chosen to match the absorption spectrum of melanin" and similarly provide that "***the wavelength*** of the irradiating field is chosen to be resonant with the natural pigment (i.e., melanin) present in the target sites (i.e., the hair shaft, bulge, matrix and papilla)." (Smith Decl., Exhs. A, col. 7, ll. 8-10, 15-18; B, col. 8, ll. 33-35, 41-43 (emphasis added).)   The patents further advise that "light-attenuating effects . . . should be considered during selection of the optical field's ***wavelength.***"  (Smith Decl., Exhs. A, col. 7, ll. 32-35; B, col. 8, ll. 60-63) (emphasis added).  The patents-in-suit then provide a list of lasers—sources of optical radiation of a single wavelength—to use to generate the chosen wavelength.  (Smith Decl., Exhs. A, col. 7, 11. 43-53; B, col. 9, ll. 4-14.)  By contrast, the patents-in-suit do not disclose employing irradiating fields comprising multiple wavelengths, and do not describe any sources of incoherent or broadband light.

### 2.       Pulse Durations of Optical Radiation

Similarly, with respect to the optical radiation's pulse duration, the patents-in-suit only disclose how to achieve the desired pulse durations using a monochromatic light source, namely lasers.  For example, the patents explain that normal mode pulses produced by "ruby, alexandrite, Ti:sapphire, or ND:YAG lasers are preferred" because these are high energy and typically have an appropriate pulse duration.  (Smith Decl., Exhs. A, col. 8, ll. 29-32; B, col. 10, ll. 6-9.)  The patents-in-suit further explain that pulse durations may be manipulated to achieve the needed pulse duration by "modulation," a known technique applicable to lasers*.  (See Smith Decl., Exhs. A, col. 8, ll. 22-42; B, col. 9, l. 66 – col. 10, l. 18) (emphasis added).  They do not

teach how to achieve appropriate pulse durations using a source of optical radiation comprising multiple wavelengths, such as an incoherent light source.[2]

### 3.    The Spatial Profile of Optical Radiation

Again, with respect the optical radiation field's spatial profile, the patents-in-suit describe achieving the desired profile with reference to lasers, explaining that the spatial profile is "chosen to allow multiple hair follicles to be irradiated with a single *laser* shot." (Smith Decl., Exhs. A, col. 8, ll. 65-67; B, col. 10, ll. 47-49 (emphasis added).) "In the case where the illuminating *laser* generates a beam having a diameter less than preferred values," however, a user may "expand the beam prior to delivery." (Smith Decl., Exhs. A, col. 9, ll. 48-50; B, col. 11, ll. 55-62) (emphasis added). No mention is made regarding how to generate the appropriate spatial profile with an optical radiation field comprising multiple wavelengths.

### 4.    The Intensity of Optical Radiation

The patents-in-suit also address the appropriate intensity of a monochromatic optical radiation field and how to manipulate the intensity, if needed: "It may be necessary to increase or decrease the optical fluence [*i.e.*, intensity] in order to heat the hair follicle to the desired temperature if the *wavelength* of the irradiating light field does not lie in the preferred spectral regions . . . . In addition, in cases where the *laser* output is below the desired optical fluence, it may be necessary to amplify the individual pulses prior to irradiating the skin." (Smith Decl., Exhs. A, col. 10, ll. 5-12; B, col. 11, ll. 55-62) (emphasis added). Amplifying a pulse is a technique necessarily used with lasers and single wavelength light sources. (The term "laser" stands for "Light Amplification by Stimulated Emission Radiation.") The patents-in-suit do not

---

[2] By contrast, Dr. Eckhouse's '368 Patent teaches how to generate selected pulse durations using an incoherent light source. (*See* Smith Decl., Exh. C) (U.S. Patent No. 5,405,368), col. 7, l. 34-col. 8, l. 4.)

describe how to generate the needed fluences using a source of optical radiation comprising multiple wavelengths.

### 5.      Alternative Embodiments of the Invention

At the conclusion of the written description, the patents-in-suit include a boilerplate statement that "[o]ther embodiments are within the scope" of the claims that follow the specification.  Specifically, they note that the disclosed contact device of the preferred embodiment may not need to be cooled, or that "for certain skin types, use of an optical field having ***the preferred wavelength***, pulse duration, spatial profile, and intensity may obviate the need for the contact device."  (Smith Decl., Exh. A, col. 12, ll. 26-28) (emphasis added); (*see also* Smith Decl., Exh. B, col. 14:17-15:52) (describing other potential embodiments of the invention).  Again, however, both patents fail to mention any embodiment employing optical radiation comprising multiple wavelengths.  The specifications of both the '568 Patent and the '844 Patent are completely silent with respect to incoherent broadband light.

### C.      Representations Made to the U.S. Patent and Trademark Office

During prosecution of the '844 patent, the applicants themselves characterized the invention claimed in the '844 Patent as employing a laser, and the USPTO Examiner understood the invention to include the use of a laser.

Original Claim 1 recited a method comprising the step of "applying optical radiation of a selected wavelength."  (Smith Decl., Exh. D) (Excerpt of the '844 Patent Prosecution History).  Original Claim 23 recited an "applicator suitable for use in practicing the method of claim 1." (*Id.*)  Original Claim 23 did not recite a source of optical radiation.  The Examiner therefore initially rejected Claim 23 as indefinite, noting that Claim 23 appeared to be incomplete:  "[T]he preamble calls for '[a]n applicator suitable for use in practicing the method of claim 1' but there is no laser source being claimed."  (*Id.*)  Thus, the Examiner believed that performing the method of claim 1 required a laser source.

The Applicants responded by distinguishing the applicator from the source of the radiation. However, in doing so, they confirmed that the source is a laser source. They stated: "With respect to claim 23, this claim is claiming the applicator, for example applicator 18. The laser source is not part of this applicator, but the output from the laser source is applied to the applicator through the inlet which is specified in claim 23." (*Id.*) This sentence confirmed the Examiner's belief that the method of Claim 1 employed a laser source.

Indeed, at no time during the entirety of the prosecution of the patent did the applicants ever suggest to the PTO that their invention made use of sources of optical radiation other than lasers. This consistent representation ultimately resulted in a Notice of Allowance issued by the PTO stating the following:

---

### *REASONS FOR ALLOWANCE*

The following is an examiner's statement of reasons for allowance: The present invention distinguishes over the prior art of record in that the prior art fails to teach or show of an optical contact device for the removal of a plurality of hairs simultaneously via laser irradiation.

---

(Smith Decl., Exh. E) (Notice of Allowance, '844 Patent, July 22, 1997) (emphasis added).

### D.    The '913 European Patent

The specification of the '913 European Patent is identical to the specification of the '844 Patent, except in the limited instances where European spelling of words like "millimetre" and "practising" is used, and citations to additional prior art The figures contained in the disclosures are identical. (*Compare* Smith Decl., Exh. B *with* Exh. M (the '913 European Patent).) The claims of the '844 Patent, when compared to the claims as issued in the '913 European Patent, are also similar.

On May 18, 2006, the Technical Board of Appeal of the European Patent Office ("EPO") determined that issued claims of the '913 European Patent were invalid for lack of support in the specification.  (Smith Decl., Exh. F) (Decision of the Technical Board of Appeal at 9-10). Specifically, the EPO ruled that when the claims were amended before the patent issued, they were impermissibly broadened beyond the disclosure of the patent when the requirement that the optical radiation be of "a selected wavelength" was omitted from the claims.

The EPO reasoned, "**The tenor of the entire patent is that laser sources are used, which have a single, i.e., selected wavelength.**  The apparatus of Figure 1 is a **laser**-based apparatus, **and all the light sources specifically mentioned are laser sources**."  (Smith Decl., Exh. F at 8) (emphasis added).  The EPO concluded:  "Had the author of this document envisaged the use of a plurality of wavelengths simultaneously he would have included a clear and unambiguous statement to that effect, but such a statement is absent from the application as originally filed, nor does the application employ expressions such as 'broadband source', 'conventional light source' etc. to cover this option."  (*Id*. at 9.)  Because the claims after amendment were not limited to light of a single wavelength, i.e., of "a selected wavelength," the EPO invalidated the claims as unsupported by the patent's disclosure.  (*Id.* at 9-10.)

### E.      The Development of Laser and Incoherent Light-Based Hair Removal Systems

#### 1.      Dr. Anderson's work on laser hair removal

It is not surprising that the '568 and '844 patents and their European counterpart only concern laser hair removal and do not discuss hair removal using incoherent light devices.  The work of Dr. Anderson and his team that led to the filing of the '568 and '844 patents focused on using a laser—rather than other light sources—to remove hair.  The inventors' descriptions of their research highlight this point.  For example, **[REDACTED]**

Finally, the experiments described in the Examples of the '568 and '844 patent all involve using a laser to remove hair. The inventors' subsequent articles regarding their early hair removal experiments and clinical testing also all concern laser hair removal. (*See, e.g.,* Smith Decl., Exh. H) (Anderson article entitled *Clinical Use of the Epilaser System*). There is no indication that the inventors performed any clinical studies in which an incoherent light device (e.g. a device using a flashlamp) was used to remove hair from patients.

**2.      Dr. Eckhouse's work on light-based hair removal**

Lasers were routinely used for dermatological procedures in the 1980s and early 1990s. In 1991-92, Dr. Eckhouse —founder and chairman of Syneron—recognized that incoherent light sources, such as flashlamps, also could be used for these treatments, and could potentially provide advantages over lasers. For example, "flashlamps are much simpler and easier to manufacture than lasers, are significantly less expensive for the same output power and have the potential of being more efficient and more reliable. They have a wide spectral range that can be optimized for a variety of specific skin treatment applications." (Smith Decl., Exh. C, col. 2, ll. 60-66.)

Dr. Eckhouse discovered how to use flashlamps to administer the energy density and wavelengths needed for skin treatment, as well as how to obtain the desired pulse widths from a broadband incoherent light source. In 1992, Dr. Eckhouse filed a patent directed to incoherent light devices for skin treatment, and methods for treating the skin with such devices, that described his solutions to these problems. (*See* Smith Decl., Exh. C.) (In total, Dr. Eckhouse received over 16 U.S. patents for his work concerning skin treatment with incoherent light.) Dr.

Eckhouse's company (ESC Medical) subsequently developed the first successful commercial incoherent light device for skin treatment—the PhotoDerm—which was approved by the FDA for the treatment of vascular lesions in August 1995.  In 1993, during clinical testing of the PhotoDerm for the removal of vascular lesions, it was observed that the device removed hair. The device's ability to remove hair was further demonstrated by an April 1994 biopsy report.[3] Dr. Eckhouse filed a patent directed to an incoherent light device for hair removal and methods of using it to remove hair in March of 1995.  (Smith Decl., Exh. I) (U.S. Patent No. 5,683,380).

In short, the claimed invention of a laser hair removal device and the invention of an incoherent light device for hair removal proceeded on different tracks and resulted in separate patent applications and patents.  Only after Dr. Eckhouse's inventions gave rise to the popularization of incoherent light devices for hair removal did Palomar seek to enlarge the scope of its laser hair removal patents to encompass incoherent light-based devices and treatments.  In the mid-1990s, Palomar's descriptions of the Anderson patents referred to them as "laser hair removal patents," and Palomar described its business venture as developing laser hair removal devices.  Several years after the success of ESC's incoherent light devices for skin treatment, including hair removal, Palomar began to develop its own incoherent light devices and started to refer to the Anderson patents as "light-based hair removal patents."

## III.   ARGUMENT

### A.   Law of Claim Construction

Claim construction is an issue of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-971 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  A claim term is interpreted

---

[3] This biopsy report was sent to Dr. Anderson.  In early 1994, Dr. Anderson received a PhotoDerm device pursuant to a confidentiality agreement with Dr. Eckhouse's company, ESC, who had engaged him as a consultant in early 1993.  The agreement precluded Dr. Anderson from disclosing or using any confidential information he received from ESC, and provided that ESC retained the rights to any inventions incorporating any confidential information provided by ESC.

according to how it would have been understood by a person of ordinary skill in the art at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). The understanding of a person of ordinary skill is not considered in the abstract, but rather in the context of the disclosures made in the patent specification itself, as well as those made by the applicant during patent prosecution. *Id.* "Thus, the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history." *Id.* at 1313; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("Usually [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.").

Claim terms are generally given their ordinary and customary meaning to a skilled artisan in the field of the invention, *Phillips*, 415 F.3d at 1312-13, but where the scope of a claim term is in dispute, relying on the "plain meaning" without consideration of the specification is insufficient. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech., Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). After all, the specification sets the outer boundaries for the permissible scope of the claims because claim terms cannot be given a broader scope than what is described or enabled. *Auto. Techs. Int'l, Inc. v. BMW of N. Am. Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007) ("[T]he specification must enable the full scope of the claims"); *see also On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006) ("[T]he scope and outer boundary of claims is set by the patentee's description of his invention."); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998) ("[C]laims may be no broader than the supporting disclosure, and therefore . . . a narrow disclosure will limit claim breadth.").

That the specification restricts the scope of an invention is consistent with the principle that a disclosure of one particular system or method used for a particular purpose does not allow the inventor "to claim any and all means for achieving that objective." *LizardTech, Inc. v. Earth Re. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005).

### B.     The '844 Patent Claim Terms

The terms in dispute—"a selected wavelength" and "a wavelength"—should be construed consistently to mean "a single chosen wavelength" and "a single wavelength."  This construction is supported by the plain meaning of the disputed claim terms in the context of the claims of the '844 Patent, the specification of the '844 Patent, the representations made to the PTO in obtaining the '844 Patent, and the reasons articulated by the PTO for allowing the issuance of the '844 Patent.  By contrast, Palomar's interpretations of these terms contradict the ordinary meaning of the terms, ignore the prosecution history of the patent, and would result in impermissibly broad claims, reaching far beyond any support provided by the patent's specification.

### 1.     "a selected wavelength"—Claims 1-3, 6-8, 17-19, 32, 38, 42, and 45-49

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| A single chosen wavelength | One or more chosen wavelengths |

With respect to the term "a selected wavelength," the parties agree that the modifier "selected" as used in the claim term should mean "chosen."  The point of disagreement is whether the term "wavelength" should be read to include a plurality of wavelengths.  Syneron maintains that "wavelength" should mean "wavelength"—in the singular.  Palomar believes that the term encompasses a plurality of wavelengths.  Palomar's belief is unsupported.

First, the plain meaning of "a selected wavelength" is "a single chosen wavelength."  Use of "selected" in this phrase indicates that one wavelength was chosen among different possible wavelengths.  The Technical Board of Appeal of the EPO recognized this point:  "The tenor of the entire application is that laser sources are used, which have *a single, i.e. selected wavelength.*"  (Smith Decl., Exh. G at 8) (emphasis added).

Second, the specification also supports Syneron's construction.  Its description of choosing a wavelength demonstrates that a single wavelength is chosen:

- Referring now to FIG. 4, *the wavelength* of the irradiating field *is chosen* to be resonant with the natural pigment (i.e., melanin) present in the target sites (i.e., the hair shaft, bulge, matrix and papilla).

- In general, in order to selectively heat the target regions, *the wavelength* of the irradiating field *is chosen* to match the . . . absorption spectra of compounds contained in the skin, such as water and hemoglobin.

(Smith Decl., Exh. B, col. 8, ll. 33-36 and 41-47) (emphasis added). Additionally, as explained above, the only sources of optical radiation described in the patent are lasers, which by definition emit light of a single wavelength. In this context, "applying optical radiation *of a selected wavelength*," as recited in the claims, must mean "applying optical radiation *of a single chosen wavelength*."

Third, as described above, the statements of the Examiner and the applicants concerning claim 23 during the prosecution of the patent indicate that both the applicants and the Examiner understood that performing the method of Claim 1 required a laser source. (Smith Decl., Exhs. J) (Non-Final Rejection of PTO) ("claims appears to be incomplete . . . there is no laser source being claimed"); K (May 12 Amendment) ("laser source is applied to the applicator"). To reach this conclusion, they must have interpreted "a selected wavelength" to mean "a single chosen wavelength."

2.      **"a wavelength"—Claims 27 and 41**

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| A single wavelength | One or more wavelengths |

The parties again dispute whether the term "wavelength" should be read expansively to include a plurality of wavelengths. The language of the claims (particularly Claim 41), as well as the limited disclosure of the specification, the representations made to the PTO in obtaining the '844 patent, and the very reason the PTO allowed the patent to issue at all, all compel the conclusion that "a wavelength" should mean "a single wavelength."

Claim 41 reads as follows:

- A method as claimed in claim 32, 33, 43, 45, 34, 44, 48, 49, 51, 53, 56, 57, or 35, wherein the optical radiation is produced by a light source producing *a wavelength or wavelengths* between 680 and 1200 nanometers.

Interposing Syneron's proposed constructions into the claim, Claim 41 would read as follows:

- A method as claimed in claim 32, 33, 43, 45, 34, 44, 48, 49, 51, 53, 56, 57, or 35, wherein the optical radiation is produced by a light source producing *a single wavelength or wavelengths* between 680 and 1200 nanometers.

Using Palomar's proposed construction, Claim 41 reads as follows:

- A method as claimed in claim 32, 33, 43, 45, 34, 44, 48, 49, 51, 53, 56, 57, or 35, wherein the optical radiation is produced by a light source producing *one or more wavelengths or wavelengths* between 680 and 1200 nanometers.

Palomar's proposed construction thus transforms the claim into a nonsensical one—the original word "wavelengths" becomes redundant and superfluous.  Such a construction is generally disfavored by the Federal Circuit, particularly where a more logical construction is readily available.  *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) *reaffirmed in Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(en banc).  In this instance, Syneron's proposed construction renders meaning to every word of the claim, and it reads logically as one would understand the term.  For these reasons alone, the Court should adopt Syneron's proposed construction and reject Palomar's.

With respect to claim 27, "a wavelength" should be construed the same as in Claim 41. The same terms should be construed consistently in different claims.  *See, e.g., Phillips*, 415 F.3d at 1314 (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) and *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997)).  Additionally, Claim 41 highlights that when the patentee sought to claim light of one or more wavelengths it knew how to do that clearly, by referring to "a wavelength or wavelengths."  "A wavelength" in Claim

27 thus must be distinct from "a wavelength or wavelengths," and refer to only a single wavelength.

Unlike Palomar's proposed construction for "a wavelength," Syneron's comports with the limited disclosure of the '844 Patent's specification.  As noted by the EPO with respect to the related '913 European Patent, "The tenor of the entire application is that laser sources are used . . . and all the light sources specifically mentioned are laser sources."  (Smith Decl., Exh. F at 8.) The same is true with respect to the virtually identical specification of the '844 patent.  The specification exclusively discloses laser sources (*see, e.g.* Smith Decl., Exh. B, col. 9, ll. 4-10)— optical sources of a single wavelength—and explains how to use lasers to implement the invention, including how to generate pulses of the appropriate duration with a laser (*Id.*, col. 9, l.66 – col. 10, l. 20), and how to expand the laser beam to the desired diameter (*Id.*, col. 11, ll. 55-62).  Additionally, the specification refers throughout to *the wavelength* of the irradiating field, and never suggests that the irradiation field could include more than a single wavelength. *Id.*, col. 8, ll. 33-36 and 41-46; col. 11, ll. 58-59.  In this context, "a source of optical radiation of *a wavelength* between 680 and 1200 nm," as recited in Claim 27, must mean "a source of optical radiation of *a single wavelength* between 680 and 1200 nm;" otherwise, the scope of the claim would exceed the patentee's disclosure.  *See On Demand Mach. Corp,* 442 F.3d at 1338 ("[T]he scope and outer boundary of claims is set by the patentee's description of his invention.")

Finally, the prosecution history also supports interpreting "a wavelength" in the limitation "a source of optical radiation of a wavelength" to mean "a single wavelength."  The prosecution history demonstrates that the Examiner and the applicants understood the applicants' inventions to use a laser as the light source.  *See supra,* II.B.  A laser constitutes a "source of optical radiation of a single wavelength."

### 3.   Palomar's proposed constructions would invalidate the claims.

The claim terms at issue are directed to "applying optical radiation of *a selected wavelength*" and "a source of optical radiation *of a wavelength*."  Palomar's proposed

constructions of "a selected wavelength" and "a wavelength" to include a plurality of

wavelengths would result in invalid claims.

First, the '844 patent does not provide written description support for claims of this

breadth. To satisfy the written description requirement, the specification "must describe the

invention sufficiently to convey to a person of skill in the art that the patentee had possession of

the claimed invention at the time of the application, i.e., that the patentee invented what is

claimed." *LizardTech,* 424 F.3d at1345. The specification of the '844 patent makes no mention

of applying optical radiation that includes multiple wavelengths or using an incoherent

broadband light source, which would emit optical radiation of multiple wavelengths.[4] The

absence of such a disclosure is particularly striking because, at the time the '568 patent was filed,

it was not common to treat the skin using incoherent light; if the applicant intended its invention

to encompass the use of incoherent broadband devices or systems including such devices, it

would have made this clear.

After reading the Anderson patents, a person of skill in the art would not understand Dr.

Anderson to have invented a method or device for removing hair that included the use of optical

radiation of multiple wavelengths or a source of optical radiation of multiple wavelengths. As a

result, construing the term "a wavelength" to mean "one or more wavelengths" or construing "a

selected wavelength" to mean "one or more chosen wavelengths" would render the claims

invalid for insufficient written description. *See Gentry Gallery,* 134 F.3d at 1480 ("[C]laims

may be no broader than the supporting disclosure, and therefore . . . a narrow disclosure will

---

[4] As noted by the EPO with respect to the related (and near identical) European patent, had the
applicant "envisaged the use of a plurality of wavelengths simultaneously [it] would have
included a clear and unambiguous statement to that effect, but such a statement is absent from
the application as originally filed, nor does the application employ expressions such as
'broadband source,' 'conventional light source' etc. to cover this option." (Smith Decl., Exh. F
at 9.)

limit claim breadth."); *LizardTech*, 424 F.3d at 1346 (holding description of a single embodiment did not entitle inventor "to claim any and all means for achieving that objective").

Second, Palomar's construction of these limitations would render the claims invalid for lack of enablement. For the enablement requirement to be satisfied, "one skilled in the art, after reading the specification," must be able to "practice the claimed invention without undue experimentation." *Auto. Techs.*, 501 F.3d at 1282. At the time of the filing of the '844 patent, it was not well known how to perform skin treatments using incoherent light. Yet the '844 patent does not disclose the incoherent light sources, such as an arc lamp or a flashlamp, that should be used to apply optical radiation of multiple wavelengths, and does not describe the appropriate structure for a device including an incoherent light source. Additionally, the '844 patent does not teach how to use an incoherent light device to obtain the needed fluences, pulse durations, and wavelengths to achieve the desired treatment effect. Thus, if the claims are construed to encompass methods applying optical radiation of multiple wavelengths or devices with a source of optical radiation of multiple wavelengths, the claims would be invalid for lack of enablement because the '844 patent would not "enable one of ordinary skill in the art to practice the full scope of the claimed invention." [5] *See LizardTech,* 424 F.3d at 1346.

Thus, if after applying the other tenets of claim construction, the Court concludes that the claim terms at issue are ambiguous, Palomar's proposed constructions of the terms should be rejected because "claims should be construed to preserve their validity." *See Phillips*, 415 F.3d at 1327-28.

_____

[5] To safeguard against this result for the '844 Patent—namely, the invalidation of all claims of the patent due to insufficient support in the specification—Palomar obtained asserted Claim 38 during reexamination proceedings on December 8, 2009. Claim 38 reads, "A method as claimed in claim 32, 33, 43, 45, 34, 44, 48, 49, 51, 53, 56, 57, or 35, wherein the optical radiation is produced by a *laser*" (emphasis added). Thus, even if all of the original claims of the '844 patent were invalidated for lack of support in the specification (mirroring what occurred to the related '913 European Patent in May 2006), at least Claim 38 would survive—because a specific claim requiring a laser would indeed be supported by a specification directed exclusively to lasers.

4.      **"removal of a plurality of hairs from a skin region, each hair being in a follicle extending into the skin from a surface"** – **Claims 1-3, 6-8, 17-19, 27, 32, 38, 41-42, and 45-49**

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| Removal of more than one hair from hair follicles in a skin region (whether the removal is permanent or temporary) | Plain meaning |

To date, Palomar has not offered any criticism of Syneron's proposed claim construction, instead urging that the term should be accorded its "plain meaning." Syneron therefore does not know how its proffered construction differs at all from the plain meaning of the term. *See O2 Micro Int'l Ltd.,* 521 F.3d at 1361 (where the scope of a claim term is in dispute, relying on the "plain and ordinary meaning" without consideration of the specification is insufficient).

To the extent Palomar may contend that the hair removal must be permanent, that simply is not the case. Palomar's own expert, Dr. Bass, conceded that the claims do not require permanent hair removal. (Smith Decl., Exh. L) (Deposition Transcript of Dr. Bass, dated July 20, 2010, at 417-19.) Palomar also may argue that this limitation requires an absence of skin damage. Nothing in this limitation, however, includes such a requirement. Syneron will provide more detailed support for the propriety of its construction in its Response Brief after it understands Palomar's criticism of Syneron's proposed construction.

C.      **The '568 Patent Claim Terms**

1.      **"means for generating optical radiation" – Claims 14, 18-20**

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| As a "means plus function" § 112 claim term, the corresponding structure disclosed in the specification—a laser | Plaintiffs agree that this is a "means plus function" § 112 claim term. Plaintiffs further state that the corresponding structure disclosed in the '568 Patent is a light source |

The parties do not dispute that this term is drafted in "means plus function" format and requires construction under 35 U.S.C. § 112 ¶ 6. The only dispute is what constitutes the corresponding structure. Palomar contends that the corresponding structure is "a light source."

Syneron more accurately maintains that the only corresponding structure disclosed in the specification is "a laser."

When a means-plus-function limitation is at issue, to construe that limitation, one must determine what "the claimed function is, and what structures disclosed in the written description correspond to the 'means' for performing that function." *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). It is undisputed that the claimed function in the limitation at issue is "generating optical radiation." The specification of the '568 Patent unambiguously identifies the corresponding structure for Claim 14's "means for generating optical radiation" as a laser. In Column 2, lines 14-16, the specification states, "The method of the invention is carried out using a device which includes means (e.g., a laser) for generating optical radiation . . . ." The specification is replete with specific examples of lasers– such as diode, Nd:YAG, Nd:YLF, Ti:Sapphire, infra-red dye, ruby and alexandrite lasers–that that could be used for practicing the claimed invention. (*See e.g.*, Smith Decl., Exh. A, col. 7, ll. 43-53, col. 7, ll. 29-32.)

By contrast, Palomar fails to identify specific structures corresponding to the "means for generating" that perform this recited function. Instead, it resorts to a generic characterization of the structure that performs the function of "generating optical radiation" by referring to it as a "light source." Federal Circuit law, however, is clear that one must identify a specific structure that performs the recited function, rather than generally referencing the type of structure that would perform the function. *See Biomedino, LLC v. Waters Techs. Corp.* 490 F.3d 946, 950-952 (Fed. Cir. 2007) ("While it is true that the patentee need not disclose details of structures well known in the art, the specification must nonetheless disclose some structure."); *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("the point of the requirement that the patentee disclose *particular structure* in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming.") (emphasis added).

For example, the Federal Circuit determined that a reference to "known differential pressure, valving and control equipment" did not describe a specific structure that performed the claimed function of "automatically operating the valves/valving," although such equipment was well known. *Biomedino,* 490 F.3d at 950-952. The court ruled: "The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing that structure. . . . Accordingly a bare statement that known techniques or methods can be used does not disclose structure." *Id.* at 952. The disclosure of "a light source" here likewise provides no information regarding the specific structure that could be used to carry out the claimed function, but rather implicitly suggests to use known light sources. This is the type of disclosure found in *Biomedino* to be inadequate.

Similarly, in *Blackboard* the Federal Circuit rejected the patentee's argument that the corresponding structure was a "server computer with an access control manager." The Federal Circuit reasoned that "what the patent calls the 'access control manager' is simply an abstraction that describes the function of controlling access to course materials, which is performed by some undefined component of the system. The ACM is essentially a black box that performs a recited function." *Blackboard*, 574 F.3d at 1383. The Federal Circuit held, "To allow that form of claiming under section 112, paragraph 6, would allow the patentee to claim all possible means of achieving a function." *Id.* at 1385. In this case, to interpret "a light source" as the corresponding structure similarly would "allow the patentee to claim all possible means of achieving" the claimed function of generating optical radiation. All means of "generating optical radiation" would fall within this general rubric.

In sum, the only specific structures identified in the specification of the '568 Patent for generating the irradiation are lasers. Thus the structure corresponding to the "means for generating optical radiation" is "a laser."

### 2.  "optical radiation" – Claims 1-10, 13, 14, 18-20, and 23-24; "the wavelength" – Claims 8-10

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| **"Optical radiation"**: Light radiation of a single wavelength | **Optical radiation"**: Light radiation of one or more wavelengths |
| **"the wavelength"**: A single wavelength | **"the wavelength"**: One or more wavelengths |

The point of dispute between the parties concerning the meaning of "optical radiation" is whether the term includes only radiation of a single wavelength, or whether it may also encompass radiation comprising a plurality of wavelengths. A related dispute concerns whether "the wavelength" means a single wavelength or more than one wavelength. The relevant claim language supports Syneron's proposed construction that "the wavelength" means a single wavelength, and that consequently "optical radiation" is limited to radiation of a single wavelength.

First, dependent Claims 8-10 each refer to a single wavelength. Claims 8, 9, and 10 of the '568 read as follows:

> 8.  The method of claim 1, wherein **the wavelength of the optical radiation is one** which is selectively absorbed by the follicles.

> 9.  The method of claim 8, wherein **the wavelength is** between 680 nm and 1200 nm.

> 10.  The method of claim 9, wherein **the wavelength is** between 800 and 900 nm or between 1000 and 1200 nm.

(Smith Decl., Exh. A, col. 12, ll. 32-39; col. 12, ll. 57-59; col. 12, ll. 60-63) (emphasis added). In Claim 8, the use of the modifier "one" demonstrates that "the wavelength" is a single wavelength. Similarly, the use of the verb "is" after "the wavelength of the optical radiation" in Claim 8, and after "the wavelength" in claims 9 and 10 further highlights that "the wavelength" must be a single wavelength.

Second, Claims 8-10 all depend from claim 1 and all refer directly or indirectly to the wavelength—i.e. the single wavelength—of the optical radiation of Claim 1.  Claim 1, however, does not expressly mention a single wavelength.  Claim 1 recites:

> 1.      A method of simultaneously removing multiple hairs, each of which is in a corresponding follicle, from a skin region of a patient, said method comprising illuminating the hairs and follicles with a large-area **optical radiation** field delivered by a transparent device in contact with the skin region, wherein said illuminating heats the hairs and follicles so that the hairs are removed while leaving the skin region substantially free of injury.

Therefore, either Claims 8-10 are making reference to a claim limitation that is not present (and consequently are invalid for lacking an antecedent basis), or the optical radiation disclosed in Claim 1 must be comprised of a single wavelength (thereby resulting in a logical reference to "the wavelength" in later dependent claims).  Construing the term "optical radiation" as "light radiation of a single wavelength" is the only interpretation consistent with the limitations of the dependent claims.  As the Federal Circuit instructs, a court "must not interpret an independent claim in a way that is inconsistent with a claim which depends from it."  *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440 (Fed. Cir. 1997); *see also Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.") (citing *Vitronics*, 90 F.3d at 1582); *Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371(Fed. Cir. 2002) ("A claim term used in multiple claims should be construed consistently.")  The term "optical radiation," therefore, should be construed as "light radiation of a single wavelength."

Construing "optical radiation" to mean "light radiation of a single wavelength" is also consistent with the specification of the '568 Patent.  As detailed above (*see supra*, II B.), the '568 Patent specification makes no mention of any optical radiation, irradiating field, or the like that includes multiple wavelengths.  The only light sources disclosed in the '568 Patent are single

wavelength light sources–namely lasers.  As the EPO recognized with respect to the related

European Patent:  "The tenor of the entire application is that laser sources are used."  (Smith

Decl., Exh. F.)  Moreover, the inventors only explain how to generate optical fields with an

appropriate pulse duration, spatial profile, and intensity using lasers.  *See supra* Section II B.

Because the specification acts as a restriction on claim scope such that a claim cannot be

construed to have a broader scope than is supportable by the specification, the term "optical

radiation" should be construed to encompass only "light radiation of a single wavelength."  *See*

*Gentry Gallery,* 134 F.3d at 1480 ("[C]laims may be no broader than the supporting disclosure,

and therefore . . . a narrow disclosure will limit claim breadth.").

The constructions Palomar seeks ultimately would invalidate the asserted claims.[6]  As

explained above with respect to the "selected wavelength" and "a wavelength" limitations, if

"optical radiation" were interpreted to allow optical radiation of multiple wavelengths, the claims

would be invalid for lack of written description and enablement support.  The '568 Patent does

not describe or enable methods that include use of an "optical radiation field" comprising

multiple wavelengths or a device that includes a "means for generating optical radiation" of

multiple wavelengths.  Thus, should the Court determine "after applying all the available tools of

claim construction" that the term is equally amenable to either Palomar's or Syneron's proposed

construction, then Syneron's proposed construction is the proper one in order to preserve the

validity of the claims.  *See Phillips*, 415 F.3d at 1327-28 (citing  *Liebel-Flarsheim v. Medrad,*

*Inc.*, 358 F.3d 898, 911) (Fed. Cir. 2004) (explaining maxim to construe claims in order to

preserve validity).

---

[6] As the EPO found with respect to the related European patent counterpart, the disclosure of the
'568 Patent is insufficient to support the breadth of the asserted claims if "optical radiation" is
construed to include radiation of multiple wavelengths.  (*See* EPO decision, Smith Decl., Exh.
F.)

3.      **"removing multiple hairs, each of which is in a corresponding follicle, from a skin region" – Claims 1-10, 13, 14, 18-20, and 23-24**

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| Removal of more than one hair from hair follicles in a skin region (whether the removal is permanent or temporary) | Plain meaning |

For the same reasons discussed above (*see supra*, III B.3) with respect to the "removal" term contained in the '844 Patent, the "removing" term in the '568 Patent should mean "removal of more than one hair from hair follicles in a skin region (whether the removal is permanent or temporary)."

## IV.      CONCLUSION

Based on the foregoing, Syneron respectfully requests that the Court adopt Syneron's proposed construction of the claim terms discussed above.

Dated: September 20, 2010              SYNERON INCORPORATED

By its attorneys:

/s/ Nicole M. Smith
Anthony L. Press (admitted *pro hac vice*)
Jill D. Neiman (admitted *pro hac vice*)
Nicole M. Smith (admitted *pro hac vice*)

MORRISON & FOERSTER LLP
555 W. Fifth Street, Suite 3500
Los Angeles, California 90013
Ph:   (213) 892-5200
Fax: (213) 892-5454
apress@mofo.com; jneiman@mofo.com;
nsmith@mofo.com

Joan M. Griffin (BBO #549522)
P.O. BOX 133
Dublin, New Hampshire 03444
Ph:   (617) 283-0954
Griffin@Lawjmg.com

## CERTIFICATE OF SERVICE

I, Nicole M. Smith, hereby certify that a copy of the foregoing document has been served upon all opposing counsel of record, by ECF on this 20th day of September, 2010.

/s/ Nicole M. Smith
Nicole M. Smith