# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION,<br><br>    Plaintiff,<br><br> v.<br><br>SYNERON INCORPORATED,<br><br>    Defendant. | Civil Action No. 08-11902 (RWZ) |
| SYNERON INCORPORATED,<br><br>    Counterclaimant,<br><br> v.<br><br>PALOMAR MEDICAL TECHNOLOGIES, INC. and THE GENERAL HOSPITAL CORPORATION,<br><br>    Counterdefendants. | **ORAL ARGUMENT REQUESTED**<br><br>**TECHNOLOGY TUTORIAL REQUESTED** |

**SYNERON INCORPORATED'S RESPONSE CLAIM CONSTRUCTION BRIEF**

**[NON-CONFIDENTIAL]**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1
II. ARGUMENT .................................................................................................................. 1
    A. The '844 Patent Claim Terms ............................................................................. 1
        1. "a selected wavelength"—Claims 1, 3, 6-8, 17-19, 32, 38, 42, and 45-49 ............................................................................................... 1
        2. "a wavelength" – Claims 27, 41; "the wavelength" – Claims 46-49. ......... 5
        3. "removal of a plurality of hairs from a skin region, each hair being in a follicle extending into the skin from a surface" – Claims 1, 3, 6-8, 17-19, 27, 32, 38, 41-42, 45-49 .......................................................... 8
    B. The '568 Patent Claim Terms ............................................................................. 8
        1. "means for generating optical radiation" – Claims 14, 18-20 .................... 8
        2. "optical radiation" – Claims 1-10, 13, 14, 18-20, 23-24; "the wavelength" – Claims 8-10 ................................................................... 10
            a. "the wavelength" ........................................................................... 10
            b. "optical radiation" ......................................................................... 13
        3. "removing multiple hairs, each of which is in a corresponding follicle, from a skin region" – Claims 1-10, 13, 14, 18-20, 23-24 ........... 14
    C. Indefinite Terms of the '844 and '568 Patents .................................................. 15
III. CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Blackboard, Inc. v. Desire2Learn Inc.*,
　574 F.3d 1371 (Fed. Cir. 2009) .................................................................................................. 9

*Dippin' Dots, Inc. v. Mosey*,
　476 F.3d 1337 (Fed. Cir. 2007) .................................................................................................. 6

*Gentry Gallery v. Berkline Corp.*,
　134 F.3d 1473 (Fed. Cir. 1998) ................................................................................................ 14

*Halliburton Energy Servs. v. M-I LLC*,
　514 F.3d 1244 (Fed. Cir. 2008) ................................................................................................ 13

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
　381 F.3d 1111 (Fed. Cir. 2004) .................................................................................................. 5

*Inverness Med. Switz. GmbH v. Princeton Biomeditech*,
　309 F.3d 1365 (Fed. Cir. 2002) ............................................................................................. 2, 5

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
　430 F.3d 1377 (Fed. Cir. 2005) ................................................................................................ 15

*Laminations, Inc. v. Roma Direct Mktg.*,
　516 F. Supp. 2d 404 (M.D. Pa. 2007) ........................................................................................ 2

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
　7 F.3d 1571 (Fed. Cir. 1993) ...................................................................................................... 6

*Orbital Technologies v. PFO Lighting*,
　2008 U.S. Dist. LEXIS 85925 (W.D. Wis. Oct. 22, 2008) ........................................................ 6

*Symbol Techs., Inc. v. Opticon, Inc.*,
　935 F.2d 1569 (Fed. Cir. 1991) .................................................................................................. 9

*Tivo, Inc. v. Echostar*,
　516 F.3d 1290 (Fed. Cir. 2008) ............................................................................................. 6, 7

I.      INTRODUCTION

The work of Dr. Anderson and his co-inventors that led to the filing of the '568 and '844 patents ("the Patents") concerned laser hair removal. The Patents only describe laser hair removal, and do not even mention the use of broadband, incoherent light to remove hair. Palomar's efforts, years after the filing of the Patents, to expand the terms at issue, such as "a selected wavelength," "a wavelength," and "optical radiation" to encompass broadband light should be rejected. Palomar's expansive constructions are contrary to the language of the claims at issue, and are not supported by the specification. The prosecution history also confirms that only the use of light from a laser, *i.e.* of a single wavelength, was contemplated by the applicants and the Examiner.

In arguing for its proposed constructions, Palomar relies on quotations from the Patents' specifications, taken out of context, that include the word "wavelengths" or "range." In context, these passages describe the various wavelengths of light that could work for hair removal because of the light absorption properties of substances in the skin and hair. None of them suggests that optical radiation comprising multiple wavelengths should be used for the treatment.

Palomar does not cite a single reference in the Patents to flashlamps or other broadband light sources, but rather quotes numerous instances in which the light sources are described as lasers, sources of light of a single wavelength. Palomar relies on extrinsic evidence in an effort to avoid a basic proposition known to even beginning physics students—laser light is monochromatic. The references it cites do not undermine this fundamental principle. Palomar should not be permitted to transform its laser hair removal patents into patents that cover hair removal using broadband light through its proposed constructions of the terms at issue.

II.     ARGUMENT

    A.     The '844 Patent Claim Terms

        1.     "a selected wavelength"—Claims 1, 3, 6-8, 17-19, 32, 38, 42, and 45-49

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| A single chosen wavelength | One or more chosen wavelengths |

Palomar fails to demonstrate that "a selected wavelength" should mean "one or more chosen wavelengths," as it contends.[1] Palomar ignores that the ordinary meaning of "a selected wavelength" is "a single chosen wavelength" and offers no basis for broadening the plain meaning of this term to encompass more than one chosen wavelength.

First, contrary to Palomar's assertions, the claim language supports Syneron's interpretation of this phrase. For example, independent claims 1, 17, and 32 require "applying optical radiation of a selected wavelength and of a selected fluence." As explained by Professor Siegman, a pulse of optical radiation can only have a single fluence. (Siegman Decl. ¶ 8.) Because "a selected fluence" must mean "a single chosen fluence," "a selected wavelength" must mean "a single chosen wavelength." *See Laminations*, *Inc. v. Roma Direct Mktg.*, 516 F. Supp. 2d 404, 415 (M.D. Pa. 2007) (Claim terms "are presumed to be used consistently throughout the patent. . . . This presumption logically takes on greater force where, as here, the identical terms are used in the same claim."); *Inverness Med. Switz. GmbH v. Princeton Biomeditech*, 309 F.3d 1365, 1371 (Fed. Cir. 2002) (claim term in multiple claims should be construed consistently).

Second, the portions of the specification Palomar relies on do not support Palomar's proposed construction. The statement that "[o]ther properties of the field, such as *the wavelength* and pulse duration, may be varied by controls" is not evidence that "a selected wavelength" means one or more chosen wavelengths as Palomar contends. ('844 Patent, col. 4:48) (emphasis added). To the contrary, it highlights that the optical field has a single wavelength by

---

[1] Palomar attempts to mislead the Court in asserting that no one has argued that the claims of its patents are limited to optical radiation of a single wavelength. (Palomar Br. at 5.) To the contrary, in a letter to Syneron on December 20, 1995,
**[REDACTED]**

(Press Decl., Ex. A, at 1.) Moreover, Palomar neglects to tell the Court that in the European Opposition proceedings involving the European counterpart to the Patents, the parties opposing the corresponding European patent asserted that its disclosure was limited to laser sources, and ultimately prevailed. (*See* Smith Decl., D.I. 35, Ex. F, at 4-11.)
This claim construction issue did not previously arise before this Court because Candela does not sell broadband hair removal devices, and Palomar's second lawsuit against Cutera (concerning its broadband IPL products) settled before any claim construction proceedings. The Lumenis case also settled, with Lumenis paying no royalties on its broadband flashlamp products. (*See* Press Decl., Ex. B, § 4.3(b).)

referencing "the wavelength" of the field. The varying of this single wavelength using controls that "adjust components (e.g., gratings, mirror or filter positions, shutters, or pulse-forming means) of the light source 12," as disclosed in the '844 patent (col. 4:48-53) does not result in optical radiation with multiple wavelengths. Rather, the single wavelength of the optical field would be shifted, *i.e.*, changed to a different wavelength. The EPO explained this point when Palomar made a similar argument with respect to the same language in the European counterpart:

> The sentence linking pages 5 and 6 states: "Other properties of the field, such as the wavelength and pulse duration, may be varied by controls 26 which adjust components (e.g., gratings, mirror or filter positions, shutters, or pulse-forming means) of the light source 12; however, for preferred embodiments wavelength would not be adjusted." Bearing in mind that this is in the context of laser sources (see page 5, lines 14 and 30 and page 6, line 4) *if the filter is for adjusting the wavelength, then this would only shift the wavelength, not cause the simultaneous emission of multiple wavelengths, i.e. the source wavelength would still be selected.*

(*See* Smith Decl., D.I. 35, Ex. F, at 8) (emphasis added).

Similarly, the specification's disclosure of an "array of diode lasers" does not support Palomar's position. Individual laser diodes of an array emit light of the same wavelength, and the light emitted by an array can be considered a single wavelength. (Siegman Decl. ¶¶ 5-6.)

Palomar's reliance on quotations taken out of context from column 8 of the '844 patent that refer to "wavelengths" or light falling in a particular wavelength "range" also is misplaced. (Palomar Br. at 17) (citing Col. 8:47-48, 53-54, and 56-59.) The paragraph from which these quotations are taken makes clear that a single wavelength is chosen for the irradiating field:

> Referring now to FIG. 4, *the wavelength of the irradiating field is chosen* to be resonant with the natural pigment (i.e., melanin) present in the target sites (i.e., the hair shaft, bulge, matrix and papilla).
>
> . . . .
>
> In general, in order to selectively heat the target regions, *the wavelength of the irradiating field is chosen* to match the absorption spectrum of melanin, which basically absorbs light from about 200 to 1200 nm; conversely, *the wavelength* is mismatched to the absorption spectra of compounds contained in the skin, such as water and hemoglobin.
>
> . . . .
>
> In addition, other light-attenuating effects besides absorption, e.g., scattering of radiation, are also wavelength-dependent, and should be considered during *selection of the optical field's wavelength*.

3

(Smith Decl., D.I. 35, Ex. B) ('844 Patent, col. 8:33-36, 41-47, and 59-63.) (emphasis added).

Palomar's snippets are not to the contrary. When these phrases are read in context, it is clear that they concern the wavelengths that would work for hair removal due to the light absorption properties of substances in the skin and hair. They do not indicate that the optical field used for hair removal should include more than one wavelength. For example, referring to Figure 4 of the patent, one of the sentences from which Palomar quotes a part provides in full, "Light having wavelengths between 680 and 1200 nm, a range indicated by the arrow 70 in the figure [Fig. 4], is effectively absorbed by melanin while being relatively transmitted by both hemoglobin and water, and therefore can be used for selective heating of pigmented hair surrounded by white or lightly tanned skin." (Col. 8:47-52.) This sentence suggests that light with wavelengths within the cited range has properties that could be useful for hair removal; it does not teach that multiple wavelengths from that range should be used simultaneously.

Indeed, when Palomar relied on the same language from the corresponding European patent in an effort to argue that the patent discloses the optical radiation of multiple wavelengths, the EPO rejected Palomar's argument for just this reason:

> The description on page 11, lines 1 to 24 is a general discussion of the mechanism of light absorption, and is based on the known phenomenon that light is best absorbed by a substance having a matching absorption spectrum so that an appropriate light source should be used. This passage does not say anything about a specific light source, but the next paragraph again cites laser sources.

(Smith Decl., D.I. 35, Ex. F, at 9; Press Decl., Ex. C, at 11:1-24.)

The final sentence of the specification relied on by Palomar concerning "[s]ources generating visible or near-infrared light in the preferred range of 680-1200 nm" actually supports Syneron's position that "a selected wavelength" is limited to a single chosen wavelength. The remainder of this sentence references light sources suitable for practicing the alleged invention. As the quote makes clear, all of these light sources mentioned are "lasers," which are light sources of essentially a single wavelength. *See* Palomar Br. at 17-18 (quoting Col. 9:4-8); *see also id.* at 10-11, 16 (quoting same language, which ends with the word "lasers.")

Finally, Palomar ignores the prosecution history of the '844 patent, which indicates that the Examiner and the applicants understood that the inventions of the patent were limited to lasers. (Syneron Br. at 6-7.)

### 2. "a wavelength" – Claims 27, 41; "the wavelength" – Claims 46-49.

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| A single wavelength | One or more wavelengths |

There is no support for Palomar's construction of "a wavelength" or "the wavelength" in the claims themselves, the patent's specification, or the file history.

First, Syneron's proposed construction of "a wavelength" to mean "a single wavelength" is consistent with the language of the claims. Palomar's construction is not. Claim 41 recites "a light source producing a wavelength or wavelengths between 680 and 1200 nanometers." If "a wavelength" meant "one or more wavelengths," as Palomar contends, claim 41's reference to "or wavelengths" would be superfluous. Such a construction is disfavored. *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

Palomar's argument that Syneron's construction is inconsistent with the language of claim 27 also fails. The language of Claim 27 reads in pertinent part:

> a source of optical radiation of a wavelength between 680 and 1,200 nm, a fluence between 10 and 200 J/cm$^2$ and a pulse duration between 50μs and 200 ms. . . .

('844 patent, col. 18:45-47.) Contrary to Palomar's contentions, that the claim indicates that the optical radiation must have "a wavelength between 680 and 1,200 nm," does not suggest that it should have multiple wavelengths. Palomar points to nothing that supports this implausible reading of the claim. Rather, the plain language of the claim requires the optical radiation to have a wavelength of a certain value, a fluence of a certain value, and a pulse duration of a certain value. The same term—"a"—used before wavelength, fluence, and pulse duration should be construed consistently throughout the claim. *See Inverness*, 309 F.3d at 1371. A pulse of optical radiation cannot have more than one fluence or more than one pulse duration. (Siegman Decl. ¶ 8.) Thus, "a" fluence and "a" pulse duration should be interpreted to mean "a single"

5

fluence or "a single" pulse duration.  "A" wavelength therefore also should be interpreted to mean "a single" wavelength.

Second, contrary to Palomar's suggestion that under the governing law "a" must mean one or more, "the question whether 'a' or 'an' is treated as singular or plural depends heavily on the context of its use."  *Tivo, Inc. v. Echostar*, 516 F.3d 1290, 1303-04 (Fed. Cir. 2008) (holding "an MPEG stream" means a single MPEG stream).  For example, the Federal Circuit in interpreting "a" to mean "one" explained: "While it is generally accepted in patent parlance that 'a' can mean one or more. . .there is no indication in the patent specification that the inventors here intended it to have other than its normal singular meaning."  *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1575-76 (Fed. Cir. 1993) (construing "a terminal portion" to mean one terminal portion).  Similarly, here, because the claims themselves, the specification, and the prosecution history indicate "a wavelength" means a single wavelength, it should be construed to have the singular meaning.

Moreover, in claims 27 and 41, the phrase "a wavelength" does not follow the open ended term "comprising" and introduce a claim element or step, but rather modifies the term "optical radiation" in claim 27 and is part of a phrase modifying "light source" in claim 41. Thus, most of Palomar's cases are inapposite because the portions of the claims at issue here are not "open-ended."  The use of the term "comprising" does not "reach into each" element or step of the claim "to render every word and phrase therein open-ended," and thus does not permit "a wavelength" to mean multiple wavelengths.  *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007); *see also Tivo*, 516 F.3d at 1304 (limitation that included term "an MPEG stream," construed to mean a single MPEG stream, did not include the term "comprising").

In *Orbital Technologies v. PFO Lighting*, the district court explained this point in construing a phrase very similar to the one at issue in this case.  No. 08-cv-220-bbc, 2008 U.S. Dist. LEXIS 85925 (W.D. Wis. Oct. 22, 2008).  *Orbital Technologies* concerned the meaning of "a wavelength" in the phrase "LEDs capable of providing light at *a wavelength* from about 380 nm to about 690 nm."  The court rejected plaintiff's argument, similar to Palomar's argument

6

here, that "because claims 1 and 5 begin with the word 'comprising,' the claim is 'open-ended' and any time the word 'a' is used in an open-ended claim, it must be construed to mean 'one or more.'" *Id.* at *11-12. The court distinguished between the claim's recitation of the different claim elements, such as "a power supply," and "a controller" and the phrase at issue ("light at a wavelength from about 380 nm to about 690 nm"), noting that the "phrase is not describing what the invention includes, it is describing what the LEDs are 'capable of providing.'" *Id.* at *12. The court, therefore, held that the use of the term "comprising" did not make the phrase at issue open-ended, and ruled that "a wavelength" meant "a particular wavelength," and did not encompass "one or more wavelengths." *Id.* at *12-13. A similar construction is warranted here.

Third, Palomar relies on the same sections of the specification to support its construction of "a wavelength" as it does in arguing in support of its construction of "a selected wavelength." As explained above, the out of context excerpts relied on by Palomar do not bolster Palomar's position that "a wavelength" means "one or more wavelengths."

Finally, Palomar is wrong in asserting that the prosecution history of the '844 patent does not suggest that "a wavelength" means a single wavelength. The statements of both the Examiner and the applicants during the prosecution of the '844 patent demonstrate that they all viewed the light source of the claimed inventions as a laser—a source of light of a single wavelength. (Syneron Br. at 6-7.) In fact, in allowing the claims to issue, the Examiner stated, "The present invention distinguishes over the prior art of record in that the prior art fails to teach or show of [sic] an optical contact device for the removal of a plurality of hairs simultaneously *via laser irradiation*." (Smith Decl., D.I. 35, Ex. E) (Not. of Allowance, '844 Patent, July 22, 1997) (emph. added). Palomar's statement that the inventors did not distinguish their invention from the prior art by saying it only used one wavelength, while technically correct, is highly misleading in light of the prosecution history highlighting that the invention includes a laser.

"The wavelength" in dependent claim 46 also means "a single wavelength." Dependent claim 46 depends from claim 45 which depends from claim 32. The phrase "the wavelength" in

7

dependent claim 46, therefore, refers indirectly back to the selected wavelength of claim 32, and thus, also must denote a single chosen wavelength.

      3.    "removal of a plurality of hairs from a skin region, each hair being in a follicle extending into the skin from a surface" – Claims 1, 3, 6-8, 17-19, 27, 32, 38, 41-42, 45-49

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| Removal of more than one hair from hair follicles in a skin region (whether the removal is permanent or temporary) | Plain meaning |

Although asserting that the "plain meaning" of this term should control, Palomar fails to explain what it contends is the plain meaning of the term. Syneron, therefore, cannot critique Palomar's proposed construction. To the extent Palomar contends that disruption of the growth mechanism of a follicle so that hair stops growing (whether permanently or temporarily) constitutes hair "removal" within the meaning of this term, Syneron agrees with this contention. Of course, if the hair falls out of its follicle, that also would be hair removal. In either situation, Syneron would consider this to be removal of hair from a hair follicle.

Palomar agrees with several important aspects of Syneron's definition of this term. It does not dispute that the claimed hair removal can be either permanent or temporary. This term, however interpreted, therefore should have no temporal restriction imported into it. Palomar also does not contend that this limitation requires an absence of skin injury. It therefore should not be construed to require an absence of skin damage or to prohibit removal of skin with the hair.

      B.    The '568 Patent Claim Terms
           1.    "means for generating optical radiation" – Claims 14, 18-20

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| As a "means plus function" § 112 claim term, the corresponding structure disclosed in the specification—a laser | Plaintiffs agree that this is a "means plus function" § 112 claim term. Plaintiffs further state that the corresponding structure disclosed in the '568 Patent is a light source |

Palomar's argument that the structure performing the function of "generating optical radiation" is a "light source" ignores the governing case law concerning "means plus function"

8

limitations, and relies on inapposite cases. "[T]he point of the requirement that the patentee disclose *particular structure* in the specification and that the scope of the patent claims be limited to that structure and its equivalents is to avoid pure functional claiming." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) (emph. added). Palomar fails to identify a "particular structure" that performs the recited function of "generating optical radiation," but rather provides a generic description of such a structure, referring to it as a "light source." A candle is a "light source," as is a flashlight, an incandescent light bulb, a match, a laser, a bonfire, and the sun. The diversity of these light sources highlights that the term is devoid of structure. Indeed, to use "a light source" as the corresponding structure here would result in improper "pure functional claiming," because anything that "generat[es] optical radiation" is a light source. *See id.* at 1385.

Palomar's cases are not to the contrary. In arguing that the corresponding structure need not be a laser, Palomar relies on cases that do not even address means plus function claim terms. (*See* Palomar's Br. at 8-9 (citing *TDM America*, *Tivo,* and *Netcraft*).) They therefore provide no insight as to how the Court should apply the unique "means plus function" claim construction framework to the disputed term here. Rather than importing a limitation into the claims as Palomar suggests, Syneron is following the law with respect to means plus function claims, and identifying the only specific structure disclosed in the '568 patent for generating optical radiation—a laser. A means plus function claim's scope "is not limitless, but is confined to structures expressly disclosed in the specification and corresponding equivalents." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575 (Fed. Cir. 1991) (emph. added).

Palomar's contention that "[s]tructural features that do not actually perform the recited function do not constitute corresponding structure" also is not applicable here. Lasers perform the exact function recited in the claims—"generating optical radiation." Unlike the cases relied on by Palomar, lasers do not perform an additional, unclaimed function.

In sum, the only particular structure disclosed in the specification for performing the function of "generating optical radiation" is a laser.

2.  **"optical radiation" – Claims 1-10, 13, 14, 18-20, 23-24; "the wavelength" – Claims 8-10**

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| **"optical radiation"**: Light radiation of a single wavelength | **"optical radiation"**: Light radiation of one or more wavelengths |
| **"the wavelength"**: A single wavelength | **"the wavelength"**: One or more wavelengths |

Palomar's contention that "the wavelength" means "one or more wavelengths" and "optical radiation" means "light radiation of one or more wavelengths" is inconsistent with the claim language, and relies on erroneous interpretations of out-of-context excerpts from the specification and inapposite extrinsic evidence. By considering these terms separately, Palomar fails to recognize that the use of the term "the wavelength," which means "a single wavelength," in claims 8-10 limits the scope of "optical radiation" in claim 1 to light of a single wavelength.

a.  **"the wavelength"**

Palomar's argument that "the wavelength" means one or more wavelengths ignores the language of the claims. Claim 8 clearly states that "the wavelength of the optical radiation *is one* which is selectively absorbed by the follicles." Palomar fails to explain how "the wavelength" could mean "one or more wavelengths" given this clear statement that *the* wavelength "is one," *i.e.* a single wavelength. Palomar's assertion that the claim language "between 680 nm and 1200 nm" or "between 800 and 900 nm or between 1000 and 1200 nm" in claims 9 and 10 respectively contemplates multiple wavelengths is ridiculous. It ignores that the claims state that "*the wavelength is*" within the recited ranges, which demonstrates that a single wavelength is contemplated, and depend from claim 8, which further require that "the wavelength. . . is one."

Nothing in the specification supports Palomar's position that "the wavelength" should be broadened to include more than one wavelength. Most of the snippets from the specification of the '568 patent on which Palomar relies are the same as those in the '844 patent that it relies on as allegedly supporting its interpretation of "a selected wavelength." For the reasons set forth above with respect to "a selected wavelength," they do not bolster Palomar's construction.

The additional excerpts included by Palomar in this section of its brief suffer from the same deficiencies as the others. The sentence—"*The wavelength* of the optical radiation *is*

chosen to be selectively absorbed by hair follicles and *is* preferably between 680 and 1200 nm; in especially preferred embodiments, *the wavelength is* between 800 and 900 nm, or, alternatively, between 1000 and 1200 nm."—supports Syneron's construction, not Palomar's.  By indicating that "the wavelength . . . is chosen," the statement highlights that a single wavelength of optical radiation is chosen within the recited range or ranges of appropriate wavelengths.  The mere recitation of a range of wavelengths does not indicate that the simultaneous use of multiple wavelengths within that range is contemplated.  Similarly, the fact that Table 1 lists a range of appropriate wavelengths does not suggest that use of light comprising multiple wavelengths is intended.  Indeed, the relevant parameter is listed in the Table as "Wavelength" rather than "Wavelengths," suggesting that only one wavelength should be used.

      Palomar's technical arguments fare no better.  Although asserting that the specification teaches the use of a range of wavelengths, Palomar tellingly cites only to its disclosure of laser sources.  One of the defining characteristics of lasers is that they emit monochromatic light, light of essentially a single wavelength.[2]  (Siegman Decl. ¶¶ 2-3.)  Palomar seeks to confuse this basic, well-known principle by quoting portions of books out of context and relying on hyper technicalities, such as its assertion that usually the light emitted by diode lasers includes multiple wavelengths.  A diode laser, like most lasers, emits light with a range of wavelengths that is so extremely narrow that it can be considered monochromatic.[3]  (*Id.* at ¶ 4.); (*see* Press Decl., Ex. E (Hecht, *The Laser Guidebook* at 5) ("Most lasers deliver a beam that contains only a narrow range of wavelengths, and *thus the beam can be considered monochromatic for all practical purposes*.") (emphasis added).  Even the reference book Palomar relies on notes that laser diodes

---

[2] *See* Press Decl., Ex. D (Goldberg, *Facial Rejuvenation* at 4) ("important characteristic of lasers is that the light is of the same single wavelength, that is, it is monochromatic."); Ex. E (Hecht, *The Laser Guidebook* at 2) (laser "a source of a narrow beam of monochromatic, coherent light").

[3] Palomar itself has defined laser as "an essentially monochromatic source of light with a single wavelength or very narrow band of wavelengths." (Press Decl., Ex. B, § 1.7.)  Diode lasers, like other lasers, are typically referred to as having a single wavelength. (*See*, *e.g.*, Press Decl., Ex. E at 334 ("*The wavelength* of a diode laser is determined by its structure and the bandgap of its active layer."); Ex. D at 28 ("*The* 1450-nm infrared diode laser").

have a spectral width (*i.e.* wavelength range) of 20 to 40 Angstroms, which is only two to four nanometers.  (Palomar App., Ex. K at 288.)  By contrast, the broadband sources used by Syneron emit light that extends over a range of wavelengths of at least three *hundred* nanometers, and some sources emit light with a range of 1300 nanometers.  (Siegman Decl. ¶ 4, Ex. B.)

An array of diode lasers is made up of diode lasers that produce light of the same wavelength, and the light emitted by an array can be considered to have a single wavelength.  (Siegman Decl. ¶¶ 5-6.)  For example, Dr. Anderson is a co-author of an article that describes a high-power diode laser array for hair removal and notes that "*the* emission *wavelength* is 800 nm.*"  (Press Decl., Ex. F (Ort *et al.*, *Optical Hair Removal)* at 154) (emph. added); *see also* Press Decl., Ex. G (Campos *et al.*, *Hair removal with an 800-nm pulsed diode laser)* at 442 (article co-authored by Anderson refers to a "high power 800-nm diode laser array device," and indicates it has a "long *wavelength* (800 nm)") (emph. added).[4]  Palomar deceptively cites portions of a reference book regarding problems that could result in a broader spectral output for a diode laser array, which is still quite narrow, without noting that the text explains how to avoid these problems.  (Siegman Decl. ¶ 6; Palomar App. Ex. K, at 288.)[5]

Palomar's suggestion that the Nd:YAG, Nd:YLF and ruby lasers disclosed in the patent normally have a spectrum that includes several wavelengths also is very misleading.  The '568 patent itself recites the wavelength of light produced by each of these lasers:  "Nd:YAG and Nd:YLF ($\lambda$=1064 and 1053 nm), ruby ($\lambda$ =694 nm)."  ('568 Patent, col. 7:43-46.)  Moreover, the reference Palomar cites describes the use of these lasers "without any mode-selecting elements," although there is no indication in the Anderson patents of an intention to use a laser without a mode-selecting (*i.e.* wavelength selecting) element.  (Siegman Decl. ¶ 7.)

---

[4] *See also* Press Decl., Ex. H (Emanuel *et al.*, *High-Power CW Operation of AlGaInP Diode-Laser Arrays*) at 3 (the diode laser array "operated at a wavelength of 676.4 nm.").

[5] Like those of skill in the art, Syneron regards the narrow range of wavelengths emitted by a laser to be a single wavelength.  If the Court would like the disputed claim terms to be defined to make this clear, Syneron would be amenable to defining "the wavelength," "a selected wavelength," "a wavelength," and "optical radiation" to expressly state that the terms encompass the narrow range of wavelengths emitted by a laser.

Finally, Palomar asserts that "non-laser light sources that can emit multiple wavelengths are clearly contemplated by the specification," but fails to cite to any description of such a non-laser light source in the '568 patent. There is none. The phrase "e.g. a laser" references a laser light source and does not somehow suggest an incoherent light source, as Palomar contends. Instead of citing to the '568 patent, Palomar cites to the '368 patent of Dr. Eckhouse, Syneron's Chairman. In contrast with the absence of any disclosure of an incoherent broadband light source in the '568 patent, the '368 Eckhouse patent clearly states in the section quoted by Palomar: "It is desirable to provide a light source having a wide range of wavelengths, which can be selected according to the required skin treatment . . . . Pulsed non-laser type light sources such as linear flashlamps provide these benefits." (Smith Decl., D.I. 35, Ex. C) ('368 Patent, col. 2:45-51.) If Dr. Anderson's alleged invention included the use of a broadband source that emitted multiple wavelengths, he would have include a similar disclosure.

### b. "optical radiation"

Palomar's arguments concerning the meaning of "optical radiation" improperly ignore the use of "the wavelength" in dependent claims 8-10, and the interplay between claim 1 and claims 8-10. Claim 8 depends from claim 1, and refers to "the wavelength *of the optical radiation*." Use of the term "the" before "optical radiation" indicates that the claim is referencing a previous use of the phrase "optical radiation." (*See* Press Decl., Ex. I § 3:14 (*Faber on Mechanics of Patent Claim Drafting*) (definite articles should be used only to refer to previously identified element or part).) Because claim 8 does not include another reference to "optical radiation," it must be referring back to "optical radiation" in claim 1, from which claim 8 depends. Similarly, the "optical radiation" of claim 1 must mean radiation "comprising a single wavelength," or "the wavelength" (*i.e.* the single wavelength) of claim 8 would lack an antecedent basis. *See Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (a claim could be indefinite if term does not have proper antecedent basis where such basis is not otherwise present by implication). "Optical radiation" in claim 1 therefore should be

13

construed as "light radiation of a single wavelength," and "optical radiation" in claim 14 should be interpreted to have the same meaning.

Palomar's assertion that the specification does not limit "optical radiation" to light radiation of a single wavelength also is incorrect. *Every* light source listed in the patent is a laser. As the EPO explained with respect to the corresponding European patent: "The tenor of the entire application is that laser sources are used, which have a single, i.e. selected wavelength." (Smith Decl., D.I. 35, Ex. F at 8.) None of Palomar's out-of-context quotations supports its assertions that the patent discloses light sources that generate optical radiation having multiple wavelengths, as demonstrated above.

Contrary to Palomar's assertions, the use of the term "optical radiation" in the patent's specification to describe generally the alleged invention also does not mean that the patent contemplates the use of optical radiation comprising multiple wavelengths, such as broadband light. In these sections, the patent is not concerned with the optical parameters of the radiation. When discussing these parameters, the Patents only explain how to generate optical radiation with the appropriate pulse duration, spatial profile, intensity, and wavelength using lasers. (Syneron Br. at 3-6.) There are no similar teachings with respect to broadband, incoherent light sources. One of skill in the art reading the '568 patent would not have understood the invention to include using optical radiation from broadband light sources to remove hair. Because the claims cannot be interpreted to have a broader scope than the specification support, "optical radiation" must only cover "light radiation of a single wavelength." *See Gentry Gallery v. Berkline Corp.,* 134 F.3d 1473, 1480 (Fed. Cir. 1998) (Claims may be no broader than supporting disclosure; therefore "a narrow disclosure will limit claim breadth.").

        **3.**    **"removing multiple hairs, each of which is in a corresponding follicle, from a skin region" – Claims 1-10, 13, 14, 18-20, 23-24**

| Syneron's Construction | Plaintiff's Construction |
|---|---|
| Removal of more than one hair from hair follicles in a skin region (whether the removal is permanent or temporary) | Plain meaning |

Syneron's position with respect to this term is the same as with respect to the similar "hair removal" term of the claims of the '844 Patent. *See supra* Section II.A.3.

### C. Indefinite Terms of the '844 and '568 Patents

The terms "at most minimal heating" (claims 1, 3, 6-8, 19), "without causing significant damage" (claims 1, 3, 6-8, 19), "not significantly damaged" (claim 45), and "significant permanent hair loss" (claim 42) in the claims of the '844 patent, and "substantially free of injury" in claims 1-10 and 13 of the '568 patent, are indefinite. They are so vague that one of ordinary skill, reading the claims in light of the specification, would not understand what is claimed. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.,* 430 F.3d 1377, 1383-84 (Fed. Cir. 2005) ("A claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope.") The fact that Palomar can only define the terms "minimal heating" and "substantially free of injury" by using each term in its definition demonstrates their indefiniteness. (Palomar Br. at 14, 19.) Syneron intends to prove the indefiniteness of these terms through summary judgment or at trial.

### III. CONCLUSION

For the reasons set forth above and in its opening brief, Syneron respectfully requests that the Court adopt Syneron's proposed construction of the claim terms discussed above.

Dated: October 15, 2010            SYNERON INCORPORATED

By its attorneys:

/s/ Nicole M. Smith
Anthony L. Press (admitted *pro hac vice*)
Jill D. Neiman (admitted *pro hac vice*)
Nicole M. Smith (admitted *pro hac vice*)

MORRISON & FOERSTER LLP
555 W. Fifth Street, Suite 3500
Los Angeles, California 90013

Joan M. Griffin (BBO #549522)
P.O. BOX 133
Dublin, New Hampshire 03444

**CERTIFICATE OF SERVICE**

I, Nicole M. Smith, hereby certify that a copy of the foregoing document has been served upon all opposing counsel of record, by ECF on this 15th day of October, 2010.

/s/ Nicole M. Smith
Nicole M. Smith

sf-2905479